UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| KURT STOKINGER and JANELLA STOKINGER, <br><br> Plaintiffs, <br><br> vs. <br><br> ARMSLIST, LLC, <br><br> Defendant. | **Civil Action No. _____** <br><br> **Jury Trial Demanded** |

## <u>COMPLAINT</u>

Plaintiffs Kurt Stokinger ("Officer Stokinger") and Janella Stokinger (collectively, "Plaintiffs"), by their attorneys, for their complaint against Armslist, LLC ("Armslist"), upon information and belief, allege as follows:

## <u>THE PARTIES</u>

1.     Plaintiffs Kurt and Janella Stokinger are individuals who reside at 13 Renwick Drive, Norton, Massachusetts 02766.

2.     Defendant Armslist is a limited liability company incorporated and with its principal place of business at 616 Magee Avenue, Jeanette, Pennsylvania 15644.

## <u>JURISDICTION AND VENUE</u>

3.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there exists complete diversity between Plaintiffs, citizens of Massachusetts, and Armslist, a citizen of Pennsylvania.

1

4.      This Court has personal jurisdiction over Armslist.  The Stokingers' claims relate to Armslist's purposeful contacts with New Hampshire and exercising personal jurisdiction is fully consistent with traditional notions of fair play and substantial justice.

5.      Venue is proper pursuant to 15 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to the claims occurred in this judicial district.  The firearm that was used to shoot Officer Stokinger was purchased and transferred in New Hampshire.

6.      An earlier action involving the above-named parties that was filed in the Commonwealth of Massachusetts, Suffolk County Superior court, docket number 1884CV03236, was dismissed without prejudice on October 31, 2022, with notice sent to the parties on November 1, 2022.  N.H. R.S.A. 508:10 authorizes the filing of a new action within one year after the previous judgment.

## INTRODUCTION

7.      This lawsuit concerns the irresponsible, negligent, and reckless actions of Armslist in choosing to place profits over people by creating and maintaining an online marketplace that routinely armed the criminal gun market, which resulted in the foreseeable shooting of a Boston police officer who was shot with an Armslist marketed gun.

8.      Armslist, LLC, owns and operates Armslist.com as a for-profit, web-based online firearms marketplace that enables individuals to privately purchase and sell firearms and firearm-related accessories.

9.      Armslist.com was negligently and recklessly designed in such a way that it actively encourages, assists, and profits from the illegal sale and purchase of firearms.

10.     Other companies facilitating the online sale of guns have instituted safeguards to make it more likely that guns are sold legally and responsibly.

11.     Armslist has, instead, eschewed reasonable safeguards that would minimize the risks of illegal and dangerous conduct.  Armslist installed in its product features, design elements, and content that facilitates, encourages, and assists illicit commerce in firearms.

12.     Since Armslist established its website, studies and news articles have made it clear to Armslist that its online marketplace is a haven for criminals who wish to illicitly acquire guns, and that these guns are foreseeably used in significant acts of criminal violence.

13.     Armslist's response has been to continue to maintain the dangerous online marketplace it created while refusing to institute safeguards or change the dangerous design of its website.

14.     Armslist knew or should have known that the design, policy, and content choices implemented on Armslist.com would facilitate, encourage, and assist the arming of dangerous individuals – including individuals barred from possessing firearms under state or federal law ("Prohibited Persons") – either directly or through gun traffickers purchasing from sellers on Armslist.com.

15.     Armslist knew or should have known that these Prohibited Persons would use weapons sold through Armslist.com to harm – and in some cases kill – innocent people.

16.     Prohibited Persons are barred from possessing firearms precisely because they pose an unreasonable risk to the safety of innocent people.

17.     It is especially foreseeable that Prohibited Persons will encounter and pose a severe threat to law enforcement officers who seek to apprehend them for or deter them from criminal activity.

18.     That foreseeable risk materialized in this case.

19.     On the morning of January 8, 2016, Grant Headley ("Headley"), a felon and Prohibited Person, used a .40 caliber Glock Model 27 semi-automatic handgun (the "Armslist Gun") that had initially been listed for sale on Armslist.com, to shoot Officer Stokinger, a decorated nine-year

veteran of the Boston Police Department, in the leg while Officer Stokinger was conducting an investigation.

20.     Officer Stokinger survived the shooting thanks to his fellow officers' quick reaction in applying a tourniquet to control the bleeding, plus a bit of good fortune.  Headley was able to fire five rounds before his gun jammed, leaving a live round stuck in the chamber, and seven more potentially deadly rounds in the magazine.

21.     Upon information and belief, Armslist's negligence directly and foreseeably facilitated, enabled, encouraged and assisted a gun trafficking operation that caused the Armslist Gun to flow into Headley's hands.

22.     This channeling of a gun sold through Armslist.com into the hands of criminals was far from an isolated incident.

23.     Upon information and belief, Armslist's negligent and reckless design and operation of its website assisted and encouraged Sara Johnson ("Johnson") a New Hampshire resident at the time of the sale and transfer of the Armslist Gun, to purchase scores of firearms on Armslist.com and later resell or transfer them to other persons unable to purchase guns through legal channels.

24.     Johnson purchased the Armslist Gun in New Hampshire.

25.     Johnson, who was frequently seen with convicted felon Daniel Ray Sullivan, illegally and negligently, directly or indirectly, sold the Armslist Gun to Headley.  *See*, *infra* at ¶¶ 204-12.

26.     Headley should not have had a gun because he was a career criminal who had been convicted of a felony, making him a Prohibited Person under federal law.

27.     Specifically, on the day he shot Officer Stokinger, Headley was on probation after serving the full five years of his prison sentence for a 2009 drug possession and unlawful possession of a firearm conviction.

28.     Unfortunately, as noted above, Armslist's negligent and reckless design and operation of its website, upon information and belief, facilitated, enabled, encouraged, and assisted a gun trafficking operation that allowed Headley to circumvent the legal restriction on his possession of firearms.

29.     Armslist created and employed a series of website design features that offered prohibited gun purchasers and sellers – as well as traffickers like Johnson supplying such parties – ample opportunity to purchase and sell firearms without having to undergo a background check or leaving any record.

30.     Armslist chose to establish an online firearms marketplace when it was well aware of the grave, foreseeable risk that it would thereby contribute to the illegal arming of criminals and facilitate, enable, encourage, and assist illegal acts unless it carefully structured the features and other content on the website.

31.     Indeed, Armslist established Armslist.com when numerous other companies had ceased having anything to do with internet gun purchases because the risk was too great that prohibited and other dangerous people would be able to violate and circumvent the law, obtain guns, and use them to injure or kill innocent people.

32.     Through its design, content creation, and systematic operation of Armslist.com's website features, Armslist facilitated, enabled, encouraged, and assisted precisely the kind of user activity that allowed Johnson to circumvent the law by engaging in firearms trafficking and negligently selling Headley the Armslist Gun he used to shoot Officer Stokinger.

33.     Armslist recklessly and negligently designed Armslist.com such that it facilitated, enabled, encouraged, and assisted illegal firearms sales and purchases.

34.     Armslist either knew, or had reasonable cause to believe, that the design, content creation, and systematic operation of Armslist.com would enable gun trafficking and facilitate illegal sales of guns to Prohibited Persons like Headley.

## FACTUAL ALLEGATIONS

35.     Federal law recognizes that, because firearms are lethal weapons that are sought after and used by dangerous people to harm innocent people, firearms must be carefully regulated so that they are not obtained by the wrong people.

36.     Federal firearms law labels certain categories of people, including convicted felons, the mentally ill, domestic abusers, and minors, as Prohibited Persons barred from possessing guns.

37.     To significantly reduce the risk that these Prohibited Persons do not obtain guns, federal law provides that only approved and federally licensed firearms dealers may "engage in the business" of dealing in firearms (*see,* U.S.C. 18 § 923(a)).

38.     Before "engag[ing] in the business" of dealing firearms, a person or entity must apply for and be granted a federal firearms license ("FFL") from the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

39.     Federally licensed firearms dealers are subject to regulations and obligations to minimize the risk that guns are put into the hands of people who can pose a danger to themselves or others.

40.     One such regulation imposed on FFL-holders is the requirement of conducting background checks on gun buyers.

41.     Another is keeping detailed records of firearms sales to help law enforcement investigate firearms crimes and monitor dealers.

42.     These records assist law enforcement in identifying any parties who may have been responsible for diverting firearms into the hands of dangerous individuals including Prohibited Persons.

43.     Dealers also must abide by other laws and regulations, including informing law enforcement whenever a purchaser engages in a "multiple sale," that is, buying more than one handgun within five business days.

44.     This is because such multiple sales may indicate firearms trafficking.

45.     Dealers have a duty to screen for suspicious or unlawful sales and to refuse sales where the dealers have any concern that the sale may be illegal.

46.     They also have a duty to deny a sale where they have reason to believe that the firearm may be misused to harm either the purchaser or somebody else, even if the buyer would pass a background check.

47.     As such, Dealers are recognized as primary agents of law enforcement.

48.     In enacting these background check and record-keeping requirements, Congress recognized and sought to address the inherent danger to the public posed by certain individuals possessing firearms.

49.     Conversely, unlicensed "private sellers" who are not "engage[d] in the business" of selling firearms are not subject to the same regulations as FFLs.

50.     Many people illicitly engage in the business of selling firearms while masquerading as a private seller and failing to acquire the required license.

51.     Notably, private sellers are not required under federal law to conduct background checks, a critical part of screening individuals to determine their suitability for gun ownership.

52.     Twenty-one states and Washington, D.C. require background checks on at least some private sales.

53.     However, in most jurisdictions, no such background checks are required.

54.     In New Hampshire, an unlicensed seller may only sell a handgun to a person who is personally known to them or who is a licensed seller.

55.     Firearms cannot be sold, delivered, or otherwise transferred to a person who has been convicted, in any jurisdiction, of a felony.  N.H. R.S.A. 159:7; 159:8.  In addition, under New Hampshire law, a career criminal may not own or possess a firearm.  R.S.A. 159:3-a.

56.     Additionally, when selling in their state, private sellers are not required to keep a record of the transaction.

57.     Record keeping requirements may deter criminals or traffickers who wish to avoid having their names linked to guns that may ultimately be used in crime and investigated by police.

58.     Private sales are attractive to buyers wishing to avoid a record of their purchases and buyers who fear they will or may possibly fail a background check because they are or may be a Prohibited Person.

59.     Such sales, which take place on the internet at an ever-increasing rate, account for around one-fifth of all United States gun sales, and are a key source for the black market in firearms.

**A.  Armslist.com.**

60.     Armslist.com is a for-profit web-based online firearms marketplace that facilitates, enables, encourages, and assists individuals in privately purchasing and selling firearms and firearm-related accessories.

61.     Armslist, which owns and operates Armslist.com, is not licensed as a federal firearms dealer.

62.     The company is funded through paid advertisements on Armslist.com and subscription fees.

63.     Armslist created Armslist.com after several prominent online marketplaces chose to stop facilitating online firearm sales (*i.e.*, "private sales") due to the danger of proliferation of illegal online gun sales.

64.     In 2002, eBay, the multibillion-dollar online auction and trading community, announced that it was prohibiting gun sales on its website.

65.     The company's decision to end the user listing of firearms was rooted in the belief that the internet was "*not an appropriate venue*" for that kind of merchandise, because "*the process of buying and selling firearms online is sufficiently different from the offline world*."[1]

66.     Specifically, in defending eBay's decision to prohibit firearm sales, the company's then-vice president of marketing and business development, cited the fact that "*online sellers cannot readily guarantee that buyers meet all the qualifications and comply with the laws governing firearm sales*."

67.     In or around 2007, Craigslist, the ubiquitous classified advertisements website, also banned firearm sales from its site.

68.     Other online websites that facilitate online sales by private parties, including Amazon.com's third-party seller program and Google's "AdWords" ad serving platform, similarly prohibit the listing of firearms for sale because of the high likelihood that such sales will funnel guns to the criminal market.

69.     The decisions of these online providers sent an unequivocal message to other businesses that online gun marketplaces should either be avoided entirely or should only be operated with the

---

[1] "eBay to Ban Gun Listings From Its Auction Service," The Wall Street Journal, Feb. 19, 1999.

greatest care and strong precautions designed to prevent dangerous people from using such sites to illegally acquire weapons.

70.     The responsible decisions by these online market providers to prohibit their users from using posts to facilitate firearms transactions also created a considerable void in the firearm private seller eCommerce market for those buyers and sellers wishing to illegally buy and sell guns online.

71.     Despite the known risks and inherent danger in creating a new platform devoted to enabling private seller transactions, Armslist chose to capitalize on this commercial opening and fill the void.

72.     Armslist.com's co-founder Jon Gibbon explained his rationale as follows: "*Sometime during the Summer of 2007, I saw an interview about Craigslist.com on TV.  When I heard them say that they decided to ban all gun related ads because a few users cried out for it, it inspired me to create a place for law abiding gun owners to buy and sell online without all of the hassles of auctions and shipping*."[2]

73.     Armslist.com is well aware that it primarily facilitates firearms sales without background checks by self-identified "private sellers."

74.     A 2013 examination of Armslist.com postings by the New York Times revealed that 94% of the ads on the site were posted by private sellers.[3]

75.     Because revenue from advertising on Armslist.com is correlated with the number of transactions and users Armslist.com supports, Armslist's revenue is almost entirely dependent on the sales traffic of these "private sellers."

76.     Thus, Armslist's ad sale revenue is almost entirely supported by the traffic of gun sales where a background check is not required by federal law.

---

[2] "Interview with the Founders of Armslist.com," Bearing Arms, Mar. 16, 2010.
[3] "Seeking Gun or Selling One, Web Is a Land of Few Rules," N.Y. Times, Apr. 17, 2013.

77.     Armslist knew, or should have known, that, unless it carefully designed the features and other content on Armslist.com, it would likely be facilitating, enabling, encouraging and assisting the very sort of illegal firearm sales that eBay, Craigslist, and other prominent eCommerce marketplaces sought to eliminate by prohibiting *all* gun sales on their platforms.

78.     There are good reasons that, contrary to Gibbon's statement, Armslist.com and the private seller market it fostered are more attractive to criminals than law-abiding buyers.

79.     It is not difficult for law-abiding gun buyers to find a licensed gun dealer from which to buy guns legally in the United States.

80.     Gun stores are ubiquitous in America.  In 2017, there were over 64,000 across the country, more than McDonald's, coffee shops, grocery stores, pharmacies, or 7-11s.[4]

81.     Many licensed gun dealers also maintain websites from which people can order firearms online and have them shipped to a local firearms dealer to transfer to them.

82.     These licensed dealers provide a wide variety of firearms, many of them new and in the box, often backed by warranties and service, as well as recommended accessories and other products that are of interest to many law-abiding gun owners.

83.     Because licensed dealers may buy firearms at wholesale, they generally offer lower prices than unlicensed sellers for the same product.

84.     In contrast, private unlicensed sellers offer far less variety of firearms and other products, and usually do not offer service or warranties to back up the product.

85.     Private unlicensed sellers often sell used products of questionable quality, and those guns are often sold at higher prices than at licensed dealers.

---

[4] "There are 50,000 more gun shops than McDonald's in the US," Business Insider, Oct. 6, 2017.

86.     Most, if not all, law-abiding gun buyers would prefer more selection, more service, higher quality, and lower prices.

87.     However, because, under federal law, private sellers are not required to run a background check on potential purchasers and are not required to maintain records of sales, they are attractive to people whose highest priority is avoiding a background check and records.

88.     While several online gun marketplaces provide at least some safeguards against transacting with Prohibited Persons, such as requiring transfers at licensed dealers, Armslist.com provides no such safeguards.

89.     Numerous responsible and law-abiding gun owners purposefully avoid using Armslist.com because of the inherent risks that run with posting on Armslist.com.

90.     Armslist.com's lack of reasonable safeguards and inclusion of various elements of content (discussed below) create a marketplace tailored, in part, to attract persons who wish to buy or sell firearms in a way that circumvents federal and state gun laws.

**B.  Armslist.com's Design Elements Facilitate, Enable, Encourage and Assist Illegal Firearm Purchases.**

91.     Not only did Armslist choose to enter into a business that demanded the utmost care to minimize the virtually-certain harm that it would cause, but it chose not to institute any of the numerous reasonable and feasible measures that could minimize that harm.

92.     Instead, upon information and belief, Armslist.com was designed to include features and other content that facilitated, enabled, encouraged and assisted illicit firearms purchases and sales.

93.     Armslist implemented policies, features and content on Armslist.com that facilitated, enabled, encouraged and assisted the creation and operation of unlicensed virtual firearm "stores," as well as the completion of the illicit gun sales and purchases these "stores" enable.

94.     Armslist.com has tens of thousands of guns listed, with no auctions and essentially no rules.

95.     Rather than including any measures to prevent Prohibited Persons from using its website or buying guns through it, Armslist.com enables anyone to buy guns via the website.

96.     Further, even though only licensed persons are allowed to engage in the firearms business, Armslist.com enables anyone to engage in the firearms business via its website, even if they do not have a license that allows them to do so.

97.     Armslist.com was created to enable any person with access to a computer or a smart phone who wishes to buy or sell a gun to do so by locating gun buyers and gun sellers either by clicking on a link within the website or by using the contact information provided by the other party through the website.

98.     Armslist.com made clear to buyers and sellers online that it would do nothing to enforce the law or reasonable, responsible practices, by informing users that it "*can not and will not be a party in transactions*," and that "*[i]t is the sole responsibility of the buyer and seller to conduct safe and legal transactions*."



99.     Upon information and belief, had Armslist not provided such an assurance, individuals like Johnson might have been more wary of using Armslist to engage in illicit gun purchases for fear of being detected and reported to law enforcement.

100.    Armslist included tailored tools on Armslist.com which facilitated, enabled, encouraged, and assisted gun traffickers and/or Prohibited Persons in acquiring firearms.

101.    These included tools allowing buyers to easily identify, interact with, and transact with unlicensed sellers whom they knew would not be required by federal law to keep a record of the sales nor require a background check.

102.    Specifically, Armslist.com allowed potential purchasers to filter in order to browse only guns being sold by a "Private Party," or, in other words, limit the search to private sellers who are not required to conduct background checks.



103.    As the Armslist FAQs explain: "*there are a number of features that enable you to filter out vendors. On the category selection page, there are links that allow you to view 'private party' or 'dealer' versions of the category. Additionally, on the category listings page, there are filters on the left side of the screen that allow you to toggle 'private party', 'vendor', or 'all sellers*.'"

104.    Given that licensed dealers often provide higher quality, greater selection, and more service, at lower prices, this "private" seller search function was not designed in a way that enabled a filtering process likely to be attractive to law abiding users.

105.    Instead, this filtering function primarily provides utility to people whose priority is avoiding background checks, record-keeping, and other regulations of gun sales, either because they are prohibited from possessing guns or wish to avoid law enforcement detection.

106.    Further, Armslist.com, upon information and belief, pre-labeled both "For Sale" and "Want to Buy" postings as being posted by or being directed to "Private Part[ies]" if the user did not have an established account when using the "Create a Listing" function.

107.    Because of this feature of the website design and content created by Armslist, when any user who did not have an account attempted to create a post on Armslist.com using the "Create a Listing" function, the user must select various pieces of information – such as the location of the desired transaction and the category of firearm being offered for sale/sought to be purchased (e.g. "Handguns") – from a series of introductory menus.

108.    Upon information and belief, the information on the interface page was ultimately translated into tags displayed on the advertisements produced when the user completed the process of developing the advertisement.

109.    The "Private Party" tag that later appeared on advertisements for users who did not have an established account, thus, was not produced as a result of the user selecting an option on any menus, but rather, the words "Private Party" occurring on the interface page and later reflected on advertisements were authored entirely by Armslist.com and existed as a pre-populated, default option.

110.    By automatically applying the words "Private Party" to all advertisements created by users without an account, Armslist made functioning as or seeking out a "private seller" the default for most of its users.

111.    As a result, Armslist facilitated, enabled, encouraged, and assisted users in engaging in sales/purchases without background checks, transaction records, and other restrictions.

112.    Further, because the words "Private Party" were generated entirely by Armstlist.com without any interaction from users, Armslist acted as a co-author of advertisements for sales to gun traffickers like Johnson by contributing a critical piece of content to these advertisements.

113.    Additionally, through its "Location" filter, Armslist.com allowed the purchaser to filter by "State" - without restricting  purchasers to their actual locations.

114.    Not only does this method of conducting business facilitate, enable, encourage, and assist the violation of federal law (which prohibits an unlicensed dealer from selling to anyone who resides in a state other than that in which the seller resides (*see* 18 USC § 922(a)(5))), but it also permits buyers to focus only on the twenty-nine states that have no background check requirement under state law.

115.    Hence, a search filtered to return only postings by (1) a "*Private Party*," (2) who is located in one of the states that has not closed the federal private sale loophole, enables a buyer, including gun runners and dangerous felons, to ensure that they will not have to undergo a background check.

116.    A buyer in Massachusetts, for example, could evade state law requirements – such as the Massachusetts requirement that a firearm owner have a state license before buying a gun – by finding a "private" seller in another state, such as New Hampshire.

117.    Additionally, Armslist places no limitation on the number of firearms advertisements a so-called "private seller" may post, nor does Armslist place any limitation on the number of firearms a purchaser may acquire.

118.    Armslist.com takes no steps to identify, remove, or report unlicensed dealers who are "engag[ing] in the business" of selling firearms in violation of § 923(a) by placing hundreds of firearms advertisements while posing as "private sellers."

119.    Despite allowing users to flag posts for removal, correction, and/or reporting for various reasons, Armslist.com does not allow users to flag posts as specifically reflecting, encouraging or soliciting unlawful conduct.

120.    While users were allowed to "flag" ads to invite "review and policing" by Armslist, the website refused to allow users to flag content as potentially criminal or illegal.

121.    Armslist also failed to provide the option for a seller to report any potential illegal activity (such as apparent illegal gun dealing or straw purchases) that the seller may have suspected or encountered during an Armslist.com-facilitated transaction.

122.    Armslist chose not to provide any mechanism to receive information from its users raising concerns about a particular purchaser's motives and patterns, which would enable the company to prevent such purchaser from using Armslist.com to violate laws or purchase additional guns.

123.    This business practice telegraphs to Armslist.com users that Armslist will take no steps to find out if any of the users of its website are acting unlawfully in violation of state and/or federal firearms statutes.

124.    Armslist placed the obligation to vet purchasers and screen for potentially nefarious or illegal transactions entirely on its users.

125.    The stated policies on Armslist.com explicitly and repeatedly assured its unlawful users that it would exercise no oversight regarding illegal conduct on Armslist.com.

126.    In fact, Armslist communicated that it would exercise no oversight to make sure laws are followed or not violated or subverted.

127.    Armslist informed its users that the company "*does not certify, investigate, or in any way guarantee the legal capacity of any party to transact*."



128.    However, while putting the onus on the sellers to vet their buyers, Armslist provided no mechanism for the sellers to become informed about the individuals to whom they are selling.

129.    Upon information and belief, at the time Johnson purchased the firearm, transferred it to Headley, and Plaintiff Officer Stokinger was shot, a seller had no way to examine a potential buyer's purchase history on Armslist.com to determine whether any red flags existed that would deter the seller from transacting with that purchaser.

130.    In particular, there was no way for a seller to find out whether a purchaser had made (or was making) numerous gun purchases in a short time.

131.    This red flag is something that could indicate the purchaser is illegally dealing in firearms without a license, and likely would prevent most reasonable gun sellers from selling a gun to that person.

132.    In choosing to telegraph to its users that it would be completely hands-off in the transaction process, Armslist provided a platform that enabled the circumvention of federal and state gun laws by gun sellers, buyers, and re-sellers.

133.    The features and content on Armslist.com allowed:

(a)    Users who could not pass a Brady background check, or wished to avoid recordkeeping or detection, to purchase guns without a background check or any records of sale;

(b)    Users who lived in states with additional safety laws (including requiring background checks or licenses) to easily avoid and subvert those laws.  Armslist could have limited users to local, in-state transactions, but chose to design Armslist.com in such a way that it easily enabled state laws to be subverted;

(c)    Users who were buying numerous guns to illegally sell them without a license and without limit, and without notifying law enforcement when multiple handguns were purchased.  Armslist could have prohibited illegal gun dealing on its site, and taken measures to stop it, but chose to design Armslist.com in such a way that it easily enabled illegal gun dealers; and,

(d)    Users who were selling numerous guns to illegally deal in firearms without a license and without a limit.  Armslist could have prohibited illegal gun dealing on its site, and taken measures to stop it, but chose to design Armslist.com in such a way that it easily enabled illegal gun dealers.

134.    Further, the features and content on Armslist.com:

(a)    Did not provide users who wished to sell or buy guns responsibly and legally with information about the person to whom they were selling or from whom they were buying, and did not provide laws and best practices to these users.  Armslist could have provided this information to users, but chose to maintain anonymity, secrecy, and ignorance;

(b)     Did not allow users who wished to flag suspicious and illegal conduct to do so.  Armslist could have provided users the means to flag dangerous conduct, but negligently, recklessly, or intentionally chose not to; and,

(c)     Assured users that Armslist would do nothing to enforce the law and would keep all transactions anonymous and private.  Armslist could have informed users that it would take measures to enforce the law and was committed to keeping guns out of the hands of dangerous people, but it failed to do so, even after learning with certainty that its website was enabling illegal gun purchases, sales, and shootings.

135.    Armslist.com's above-referenced website design features, filtering opportunities, and overall business model enabled Prohibited Persons and other dangerous persons who seek to avoid records of gun sales to buy guns from private sellers entirely under the radar and without a background-check, and for illegal gun sellers to supply them.

**C.  Armslist Knew or Should Have Known that its Design, Content Creation, and Policy Implementation Would and Did Lead to Harm.**

136.    It was foreseeable to Armslist that a gun trafficker like Johnson would obtain a firearm through Armslist.com because, long before the transaction that resulted in Officer Stokinger's shooting, Armslist was aware that it was enabling felonious and otherwise illegal transactions.

137.    Indeed, by that time, several comprehensive studies and reports had already revealed that Prohibited Persons were attracted to Armslist.com.

138.    A 2011 undercover investigation of illegal online gun sales conducted by the City of New York found that 62% of all private gun sellers agreed to sell a firearm to a buyer who said that he probably could not pass a background check.[5]

---

[5] "Investigation: Illegal Gun Buyers Have an Easy Time Online," Time, Dec. 16, 2011.

139.    The study found that, in particular, 54% of Armslist.com's sellers were willing to make a sale to purchasers whom they believed could not pass a background check.

140.    The results of this investigation were widely reported in the mainstream press.

141.    In 2013, Mayors Against Illegal Guns, a bipartisan group of U.S. mayors, examined sales on Armslist.com and found that the website created a massive, unregulated internet weapons market where thousands of guns were illegally offered for sale by unlicensed firearms dealers.[6]

142.    The "*investigation of high-volume online sellers show[ed] that hundreds of gun sellers were using the internet to transfer tens of thousands of firearms each year, blurring the line between private sellers and licensed dealers, undermining the background check system, and putting guns in the hands of killers*."

143.    In particular, the Mayors Against Illegal Guns report revealed that one in thirty "Want-To-Buy" ads on Armslist.com were posted by persons with criminal records barring them from owning a gun, more than quadruple the rate at which prohibited gun buyers were trying to buy guns at brick-and-mortar stores.

144.    Armslist thus enabled the flow of weapons into major cities and allowed sellers and buyers on the site to entirely skirt local gun regulations.

145.    In April 2015, then-Mayor Bill de Blasio and New York City's Department of Consumer Affairs Commissioner announced an investigation into the possible illegal and unlicensed sale of secondhand guns in New York City and issued a subpoena to Armslist.

146.    The New York Times examined private gun transactions at Armslist.com, and repeatedly found felons buying or selling guns.

---

[6] "In the Business Outside the Law: How Unlicensed Sellers Are Flooding the Internet with Guns," Mayors Against Illegal Guns, Dec. 2013.

147.    The Times concluded, "Armslist and similar sites function as unregulated bazaars, where the essential anonymity of the Internet allows unlicensed sellers to advertise scores of weapons and people legally barred from gun ownership to buy them."[7]

148.    In March 2018, a California convicted felon, Rafael "Ralphie" Sanchez, was charged in federal court in connection with an Armslist gun trafficking scheme.

149.    Sanchez would choose guns and ammunition, including AR-15 rifles and high-capacity magazines, being offered for sale via Armslist by sellers in Tennessee, where no background check is required for private gun sales.

150.    Once Sanchez had the guns in hand, he would use Facebook's private messaging service to sell them with no questions asked to buyers in California, which requires background checks for all gun purchases.[8]

151.    Prior to facilitating the transaction at issue, Armslist was aware that its website was enabling Prohibited Persons to commit horrific murders.

152.    Several guns that were used in well-publicized murder incidents were purchased through Armslist.com.

153.    The 40-caliber handgun used in the 2011 murder of Jitka Vesel in Oak Brook, Illinois was purchased illegally by her killer, Demetry Smirnov, on Armslist.com.

154.    Smirnov was an immigrant from Russia living in Canada when he made the purchase (*i.e.*, a Prohibited Person because private sellers are restricted to selling guns in-state only).

155.    A gun purchased through Armslist.com was also used in a 2012 mass casualty shooting at a spa and salon in Brookfield, Wisconsin.

---

[7] "Seeking Gun or Selling One, Web Is a Land of Few Rules," The New York Times, April 17, 2013.
[8] "FBI: TN is Gun 'Source State' for Calif. Felon," Knoxville News-Sentinel (Tennessee), April 11, 2018.

156.     The shooter, Radcliffe Haughton, purchased the FNP-40 semiautomatic handgun and ammo on Armslist.com.

157.     He used that gun to kill his estranged wife Zina Daniel Haughton and two other people.

158.     Haughton was able to buy the gun illegally despite the fact that a restraining order against him for his history of domestic violence rendered him a Prohibited Person.

159.     Accounts of fatal shootings tied to guns transacted through Armslist have continued through recent years.

160.     In approximately June 2016, a Washington, D.C. man sold a 29-year-old former Marine an AK-47 that he used to kill himself about two weeks later.

161.     Isaiah Janes, the former Marine, had been involuntarily committed to a psychiatric facility.

162.     As a result, he was prohibited from possessing a weapon.

163.     Janes had earlier attempted to buy a 12-gauge shotgun at a gun store, but did not pass the required background check and was identified as a Prohibited Person.

164.     The seller, Richard Wince, had posted almost 400 listings on two online firearms websites, including Armslist, for trade or sale over a four-year period.

165.     Wince supplied weapons to other people who could not buy them legally; another gun was used in a murder in Washington D.C.

166.     On January 8, 2018, Robert Schmidt—barred from owning a gun due to a history of domestic violence against his estranged wife—purchased a Glock 19 in a Walmart parking lot from a private seller he found on Armslist.

167.     The next day, when his wife dropped off their three children, Schmidt used the Glock to kill his wife before taking his own life.

168.     On February 13, 2018, Chicago Police Commander Paul Bauer was fatally shot by a four-time felon who had obtained a Glock 9 mm handgun most recently listed on Armslist.

169.     A private seller named Thomas Caldwell had sold the gun in 2017 to a purchaser in Milwaukee with a felony arrest record.

170.     A subsequent investigation revealed that Caldwell had posted over 200 ads for gun sales on Armslist.com.

171.     In May 2018, federal prosecutors in Chicago filed a criminal complaint against three men on charges they trafficked approximately 90 weapons from Kentucky to Chicago.

172.     Many of the guns were purchased from Kentucky sellers advertising on Armslist.com, and then resold to gang members in Chicago at a steep markup.

173.     Prosecutors alleged that even though the defendants — Christopher Henderson, of Louisville, Kentucky; John "JoJo" Phillips, of west suburban Hillside, Illinois; and Jaiqail Wright, of Chicago, Illinois — had ties to a violent faction of the Conservative Vice Lords street gang, they were able to secure an arsenal of weaponry with relative ease from Armslist.com sellers, including assault rifles, "Draco-style" machine pistols and guns with drum magazines capable of holding up to 100 rounds.

174.     A 9mm Taurus posted for sale on Armslist.com was bought by one of the defendant traffickers outside of a Louisville, Kentucky outlet mall and used just 42 days later in the April 2017 drive-by shooting of Xavier Soto, a 15-year-old boy in Chicago, who died from the gunshot injuries.

175.     Armslist knew or should have known of all of these facts about the dangerousness, and deadliness of the commerce and that they were encouraged, enabled and assisted by the design features and other content Armslist chose to include on its website.

176.     Indeed, the above instances and reports appeared to provide Armslist with actual or constructive notice about the deadly consequences of its negligent design decisions.

177.     Nevertheless, upon information and belief, Armslist maintained its dangerous website design and refused to address this problem.

178.     As Armslist knows or should know, many of Armslist's customers are illegal gun sellers.

179.     Nearly one-in-three gun ads on Armslist.com are posted by high-volume unlicensed sellers, many of whom are likely "engaged in the business" of selling firearms (*i.e.*, not really "private sellers") in violation of federal law.

180.     Such high-volume online sellers transfer tens of thousands of firearms each year, blurring the line between private sellers and licensed dealers, undermining the background check system, and putting guns in the hands of killers.

181.     Upon information and belief, at the time of this filing, Armslist has still not remedied the negligent and dangerous operation of its online marketplace.

**D.  Despite Having Notice That Armslist.com Was Supplying a Dangerous Criminal Firearms Market, Armslist Chose Not to Use Feasible Safeguards to Decrease the Number of Illegal and/or Dangerous Sales Channeling Weapons to Criminals.**

182.     The 2013 Mayors Against Illegal Guns report, discussed above, enumerated several steps that Armslist could have taken to prevent the trafficking of guns to violent criminals and drug traffickers through its website, including, without limitation: (1) monitoring high-volume sellers and issuing direct warnings to sellers appearing to be engaging in the business of selling firearms without a license, and providing users with a tool to report repeat offenders to law enforcement; (2) requiring greater transparency from users, such as requiring both buyers and sellers to register and provide credit card verified evidence of their identity before posting or purchasing through the website; and (3) requiring sellers to conduct background checks on would-be gun buyers or, at a

minimum, recommending that users conduct background checks and providing tools to facilitate such background checks.

183.    As also discussed above, Armslist.com could have required that any purchasers of guns from private sellers take delivery of their guns through a licensed dealer.

184.    Doing so would deter Prohibited Persons, and gun traffickers like Johnson, seeking to avoid a record, from making purchases through Armslist.com.

185.    Armslist also could have:

(a)    Limited the number of guns that can be sold on its website by a user;

(b)    Limited the number of guns that can be bought on its website by a user;

(c)    Required that sellers register and provide information about themselves and their firearms business;

(d)    Allowed users to flag posts as specifically reflecting, encouraging or soliciting unlawful conduct;

(e)    Incorporating a policy by which Armslist takes steps to ensure that its users are not violating any laws in selling or purchasing firearms from Armslist.com; and

(f)    Notifying users that it will monitor and report any unlawful or suspicious activity.

186.    Some or all of these procedural safeguards, which would reduce the opportunity for sellers to provide guns to unchecked buyers, have been adopted by other online gun marketplaces, such as ShootersXchange.com, GunAuction.com, GunBroker.com, and GunRunnerAuctions.com.

187.    Such safeguards are not only well-known but are also economically and technologically feasible.

188.    Armslist instead maintained its negligently designed website and failed to address the negligent design and operation of its online marketplace.

189.     Armslist is exploiting a status quo that has (1) demonstrably resulted in thousands of annual illegal gun purchases by dangerous criminals, (2) delivered the guns that were used in several high-profile killings, and (3) enabled the illegal gun trafficking scheme that resulted in the shooting of Officer Stokinger.

190.     Furthermore, as alleged herein, prior to facilitating the transaction at issue, Armslist was aware that its website was enabling the sale of weapons used in violent crimes such as those used in several well-publicized murders like the 40-caliber handgun used in the 2011 murder of Jitka Vesel and the weapon used in the 2012 mass casualty in Brookfield, Wisconsin.

191.     Armslist was thus fully aware and on notice that it designed and operated its online gun marketplace in a way that encouraged prohibited sales that unreasonably interfered with the general public's safety, peace and comfort.

**E.  Upon Information and Belief Armslist Enabled the Gun Running Operation that Allowed Headley to Illegally Purchase the Armslist Gun, Which Led to the Shooting of Officer Stokinger.**

192.     Upon information and belief, in this instance, the features and other content Armslist.com chose to install on its website encouraged and assisted more than just an isolated illegal gun sale.

193.     Upon information and belief, Armslist enabled a gun-running operation that put guns in the hands of several New England gang members, drug dealers and dangerous repeat felons like Headley.

194.     Upon information and belief, had Armslist implemented certain safeguards on Armslist.com or changed its design features and content, Johnson would likely not have been able to engage in her trafficking scheme.

195.     Instead, upon information and belief, Johnson chose to act as a firearms trafficker, and was able to do so, by using Armslist's filtering function to locate "private sellers" who would sell guns

to her without conducting background checks or keeping records of who their firearms were sold to.

196.    Upon information and belief, Johnson was also able to use the state filtering function to locate "private sellers" who were located in states that did not have their own laws requiring background checks.

197.    Upon information and belief, Derek McNamara ("McNamara"), the initial seller of the Armslist Gun, was listed as a private seller.

198.    Upon information and belief, Johnson relied on the assurances made by Armslist, that it would do nothing to ensure the firearms sold on Armslist.com were being sold in legal transactions.

199.    Upon information and belief, Johnson relied on McNamara's inability to flag her as a potentially suspicious or illegal buyer when deciding to purchase the Armslist Gun through Armslist.com.

200.    Because of these features and the assurances stated by Armslist.com, Johnson was able to engage in a trafficking scheme that channeled the Armslist Gun into the hands of Headley, a Prohibited Person, who then used the Armslist Gun to shoot Officer Stokinger.

201.    The Armslist Gun that Headley used to shoot Officer Stokinger was recovered near the scene of the shooting.

202.    The serial number on the Armslist Gun had been obliterated, but the Boston Police Crime Laboratory was able to successfully restore the number and identify the gun.

203.    An investigation by the ATF into the Armslist Gun purchased by Johnson and used to shoot Officer Stokinger, indicated that the Armslist Gun was last purchased by McNamara on March 3, 2015 from Black Op Arms in Claremont, New Hampshire, a federally licensed firearms dealer.

204.    McNamara informed the ATF Special Agent investigating the Armslist Gun's purchase history that he sold the Armslist Gun on Armslist.com for $460 to Johnson, a New Hampshire woman who contacted him through Armslist.com and said she was interested in purchasing his gun.

205.    McNamara met Johnson at a McDonald's restaurant in Warner, New Hampshire in July of 2016 and sold her the Armslist Gun.

206.    McNamara told the ATF Agent that during the transaction, Johnson had an unidentified male in her vehicle who never left the vehicle during the transaction.

207.    Daniel Ray Sullivan (Sullivan), a convicted felon, was frequently observed with Johnson, with whom he had two children.

208.    On July 26, 2017, Johnson and Sullivan were indicted in the United States District Court in New Hampshire on firearms charges.

209.    Johnson was charged with supplying a number of the guns she bought on Armslist.com to Sullivan, whom she knew to be a Prohibited Person.

210.    Both Johnson and Sullivan pled guilty to various firearms sales offenses.

211.    In Sullivan's plea, he admitted to contacting Armslist.com sellers via email and arranging meetings to purchase their guns with Johnson.

212.    Although Johnson's purchase history through Armslist.com would have revealed that Johnson made several gun purchases in a short time, because Armslist.com keeps no record of purchases, Armslist did not inform McNamara of the red flags indicating that she was likely an illegal gun dealer.

213.    Upon information and belief, shortly after Johnson purchased the Armslist Gun from McNamara, Johnson, directly or indirectly, sold the Armslist Gun to Headley.

214.    Because of several convictions, including those for felony drug and weapons charges, Headley was prohibited from purchasing the Armslist Gun.

215.    Upon information and belief, Johnson and/or Sullivan sold Headley the Armslist Gun despite knowing, or having reasonable cause to believe, that Headley was a Prohibited Person and was likely to use the Armslist Gun in a way that would create an unreasonable risk of harm to the public.

216.    The Armslist Gun sold to Headley was one of an estimated 30 to 63 firearms purchased by Johnson through Armslist.com.

217.    According to the ATF Agent investigating her case, Johnson's gun-running operation involved purchasing numerous guns from private sellers she contacted through Armslist.com.

218.    She would meet her sellers in various parking lots to complete the cash transactions.

219.    At least four of the firearms purchased by Johnson were subsequently recovered on the streets of Greater Boston within seven months or less of Johnson purchasing them.

220.    When she purchased the firearms, the guns' serial numbers were, upon information and belief, still intact.

221.    Upon information and belief, Johnson would then destroy the serial numbers before reselling the guns for a profit across state lines.

222.    The four firearms that the ATF recovered in Boston and traced back to Johnson all had their serial numbers obliterated.

223.    Johnson bought multiple guns from the same sellers, at least one of whom was also engaged in illegal gun trafficking.

224.    In February 2018, Johnson pled guilty to several federal firearms charges, including aiding and abetting possession of firearms by Prohibited Persons, resulting from the resale of guns which she purchased on Armslist.com.

225.    In a similar case and just six months prior, federal authorities raided the home of David Bosari, who (like Johnson) was from Manchester, New Hampshire, and who was suspected of illegally selling guns he had bought on Armslist and other websites.

226.    Between September 2016 and February 2017, Bosari arranged transactions involving 20 firearms.

227.    In the same pattern, guns purchased online by Bosari were recovered in the possession of criminals or juveniles stopped by police in Massachusetts: a felon in Beverly, Massachusetts; a person facing a restraining order in Cambridge, Massachusetts; a juvenile in Everett, Massachusetts; and gang members in Chelsea, Massachusetts.

## CLAIMS FOR RELIEF
### COUNT I:
(Negligence)

228.    Plaintiffs repeat and reallege the allegations set forth above in this Complaint as if fully set forth herein.

229.    IN A PLEA OF CASE, Armslist negligently and deliberately created an online firearms marketplace, Armslist.com, by which dangerous people could illegally buy and sell guns.

230.    At all relevant times, the Defendant, Armslist, LLC, had a general duty to the public – including to law enforcement personnel like Officer Stokinger – to exercise reasonable care in creating and maintaining a marketplace for the sale of guns, in facilitating the sale of guns, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

231.    At all relevant times, Armslist was subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

232.    At all relevant times, Armslist owed a duty to the public, including Officer Stokinger, to operate its website, Armslist.com, in a commercially and legally reasonable manner.

233.    As the operators of a website that creates a permanent, 24/7 marketplace for the private sale of lethal weapons among strangers, Armslist had a duty to use reasonable care, and not to enable and facilitate illegal gun sellers and buyers, as well as not to design a website that made it so easy for gun transactions to be made in violation of existing gun laws.

234.    Armslist knew or should have known that the content and design of Armslist.com was likely to supply Prohibited Persons like Headley either directly or through traffickers like Johnson.

235.    NOTWITHSTANDING THE AFORESAID DUTIES, Defendant Armslist, LLC, did fail in each of the aforementioned duties such that Armslist enabled Headley to easily acquire a firearm on the street from Johnson, who purchased her wares through Armslist.com.

236.    Armslist breached its duties by, inter alia:

    a)    Negligently, recklessly, or intentionally designing Armslist.com in such a way that it enables gun trafficking and facilitates sales to Prohibited Persons; and

    b)    Failing to provide any training, instructions, warnings or guidance to persons who would foreseeably use Armslist.com to sell firearms; and

    c)    Failing to employ reasonable design safeguards, including questioning, screening, warnings, instructions, and monitoring that would prevent illegal buyers and sellers from using its site, and prevent any user from violating the law or arming dangerous people, thereby facilitating sales to purchasers like Johnson, who was purchasing numerous firearms for the purpose of illegal resale to Prohibited Persons; and

    d)    Failing to require that purchasers take delivery of guns through licensed dealers legally required to maintain records of transactions that would deter gun traffickers like Johnson from using Armslist.com to supply their gun trafficking operations; and

    e)    Failing to monitor high-volume purchasers; and

f)      Failing to provide mechanisms that would allow sellers to vet purchasers' purchase history so as to determine whether any red flags exist; and

g)      Failing to allow users to flag potential criminal or illegal content or activity; and

h)      Failing to require sellers to conduct background checks on would-be gun buyers; and

i)      Failing to recommend that sellers conduct background checks and to provide tools to facilitate background checks; and

j)      Failing to require buyers to provide evidence than they are a legal purchaser; and

k)      Failing to require that buyers and sellers register; and

l)      Allowing purchasers to filter by "private seller," enabling the purchaser to choose a seller who would not subject them to a background check or keep records of the sale; and

m)      Allowing purchasers to filter by location, enabling the purchaser to select a gun for sale in a state with no background check requirement; and

n)      Failing to provide extensive and regularly updated information regarding all applicable firearms laws; and

o)      Drafting policies that assure Armslist.com's users that Armslist will exercise no oversight regarding illegal conduct on Armslist.com.

237.    Breach of these duties constitutes negligence.

238.    These safeguards are not only reasonable but also economically and technologically feasible.

239.    AS A PROXIMATE RESULT OF THE NEGLIGENCE OF THE DEFENDANT, the Plaintiff, Officer Kurt Stokinger, suffered severe bodily injuries.

240.    Because of Armslist's breaches of its duties, Johnson was able to use Armslist.com for the purpose of funneling numerous firearms illegally to dangerous criminals, including the transfer of the Armslist Gun to Headley.

241.   Johnson's Armslist.com-based gun trafficking operation was a substantial factor, as it provided the Armslist Gun to a prohibited purchaser who then used the firearm to shoot Officer Stokinger.

242.   Upon information and belief, these violations foreseeably motivated and assisted Johnson, a gun trafficker, in using Armslist.com to locate McNamara's posting and illegally acquire the Armslist Gun while avoiding a background check or a record of the transaction.

243.   Because of Armslist's breaches of its duties, Johnson was able to sell the Armslist Gun to Headley, a Prohibited Person, which he then used to shoot Officer Stokinger.

244.   Headley's ability to obtain the Armslist Gun illegally was a substantial factor in the shooting of Officer Stokinger.

245.   Armslist knew or should have known that gun traffickers like Johnson frequently transport firearms across state lines into states with stricter rules for obtaining a firearm.

246.   Armslist knew or should have known that gun traffickers like Johnson primarily supply dangerous criminals unable or unwilling to access the legal firearms market – including, frequently, Prohibited Persons like Headley – either directly, as in this case, or through other criminal intermediaries.

247.   Armslist knew or should have known that these ultimate end users pose a serious risk of harm to members of the general public and are particularly likely to kill or injure law enforcement officers like Officer Stokinger because they are especially likely to become involved in confrontations with law enforcement.

248.   Given the design and operation of the Armslist.com website, which facilitated and allowed gun trafficking and sales to Prohibited Persons, and given the previous horrific murders by persons using guns purchased illegally through Armslist.com, the shooting of, and injury to, innocent

persons such as Officer Stokinger was a foreseeable result of Armslist's negligent, reckless, and/or intentional conduct.

249.    As a direct and proximate result of Armslist's negligence, as alleged herein, Officer Stokinger has suffered personal injuries and damages including significant past and future pain, suffering, disability, emotional distress, and loss of enjoyment of life, loss of consortium, lost wages, and other compensable injuries and damages, all to his damage in an amount to be determined at a trial of this matter.

250.    Armslist's actions were a direct and proximate cause of the injuries to Officer Stokinger.

251.    The shooting of Officer Stokinger was a foreseeable result of Armslist's negligent conduct.

252.    Armslist's negligence directly, foreseeably, and proximately caused a police officer to be shot by enabling a known drug dealer and convicted felon to illegally purchase a gun he could not legally obtain.

253.    Armslist's acts or omissions were wanton, malicious, and/or oppressive, which entitle the Plaintiffs to enhanced compensatory damages.

<u>COUNT II:</u>
(Aiding and Abetting Tortious and Illegal Conduct)

254.    Plaintiffs repeat and reallege the allegations set forth above in this Complaint as if fully set forth herein.

255.    Armslist aided, abetted, and acquiesced in Johnson's negligent and illegal sale of the Armslist Gun that was used to shoot Officer Stokinger to Headley, a dangerous Prohibited Person, in violation of 18 U.S.C. § 922(d), by, *inter alia*, providing substantial assistance to Johnson by brokering the anonymous transaction between Derek McNamara and Johnson, whereby Johnson purchased the Armslist Gun.

256.     Armslist provided further substantial assistance to Johnson by shifting the responsibility of vetting purchasers to sellers like Derek McNamara, whom Armslist knew or should have known would not have the resources or be qualified to perform such vetting and by otherwise acting recklessly and/or negligently.

257.     Such conduct was in knowing violation of state and federal aiding and abetting statutes, which are applicable to the sale, marketing, and facilitation of the sale of firearms, and the violation was a cause of Officer Stokinger's harm.

258.     Armslist's conduct was negligent and/or reckless because, as a result of (a) several publicized incidents where Armslist.com was directly identified as the conduit that enabled Prohibited Persons to obtain weapons used in crimes, and (b) several comprehensive investigations and reports which concluded that Armslist.com was being actively utilized by criminals and other Prohibited Persons to obtain firearms, and utilized by high-volume dealers to avoid background checks by posing as private sellers, Armslist had knowledge that sellers and purchasers on Armslist.com were committing torts.

259.     As a result of Armslist's aiding and abetting tortious conduct, as alleged herein, Officer Stokinger has suffered personal injuries and damages including significant past and future pain, suffering, disability, emotional distress, and loss of enjoyment of life; past and future medical expenses; past wage loss and impairment of future earning capacity, and other compensable injuries and damages, all to his damage in an amount to be determined at a trial of this matter.

260.     Armslist's acts or omissions were wanton, malicious, and/or oppressive, which entitle the Plaintiffs to enhanced compensatory damages.

## COUNT III:
### (Public Nuisance)

261.    Plaintiffs repeat and reallege the allegations set forth above in this Complaint as if fully set forth herein.

262.    Armslist, LLC owns and operates Armslist.com as a for-profit, web-based online firearms marketplace which enables individuals to privately purchase and sell firearms and firearm-related accessories.

263.    Armslist is not a federal firearms dealer.

264.    Armslist is aware – and has been aware since it opened its business – that it caters to people who seek to circumvent federal and state laws that keep guns out of dangerous hands.

265.    Over the years, since the Brady Law requiring that FFL-holders submit purchasers to a background check was enacted in 1994, there has been growing recognition that a significant portion of firearms business in the United States is conducted by unlicensed private sellers who are not required to implement background checks.

266.    Twenty-one states and Washington, D.C. have extended their background check requirement beyond federal law to apply to at least some private sales, thereby closing the federal private sale loophole.[9]

267.    However, the federal law loophole allows private sellers who are not engaged in the firearms business (in the twenty-nine states that have no background check requirement) to sell firearms without performing any background check whatsoever.

---

[9] Thirteen states (California, Colorado, Connecticut, Delaware, Maryland, Nevada, New Mexico, New York, Oregon, Rhode Island, Washington, Vermont, Virginia) and Washington, D.C. require universal background checks at the point of sale for all sales and transfers of any class of firearms, whether they are purchased from a licensed or unlicensed seller. Pennsylvania requires point of sale background checks for handguns but not rifles and shotguns. Four states (Hawaii, Illinois, Massachusetts, and New Jersey) require all firearm purchasers to obtain a permit, issued after a background check, to buy any firearm. Finally, three states (Michigan, Nebraska, and North Carolina) require all firearm purchasers to obtain a permit, issued after a background check, to buy handguns, but not rifles and shotguns. Illinois also requires a point of sale background check whenever a firearm is sold at a gun show.

268.    As a result, convicted felons, domestic abusers, and other persons who are recognized as too dangerous to possess guns, can obtain guns from sales without background checks.

269.    For years, there has been growing recognition that many private unlicensed sellers are illegally engaged in the business of selling firearms without a license that permits them to do so legally.

270.    As multiple and repeat firearms purchases are a known indicator of potential illegal gun trafficking, federal law requires that licensed dealers report "multiple sales" (when a purchaser buys more than one handgun in five business days) to the ATF.

271.    Private sales are attractive to buyers wishing to avoid a record of their purchases and buyers who fear they will fail a background check.

272.    Private sales, which have been occurring on the internet at an ever-increasing rate, fuel the black market for illegal guns.

273.    In a 2017 published gun trace report, the city of Chicago noted that the number of guns available on Armslist.com had jumped from 12,000 to 148,000 — a twelve-fold increase — since 2011.

274.    Private sales conducted over the internet have frequently been linked to illegal gun trafficking and sales to minors.

275.    Internet sales, including when the transfer is made via a licensed dealer, have also been connected to several well-documented mass shootings, including the 2007 shooting at Virginia Tech University, which killed 32 people and left over a dozen wounded, and the 2008 shooting at Northern Illinois University, where 5 were killed and 17 more were wounded.

276.    The perpetrator of the 2012 shooting in Aurora, Colorado purchased more than 6,000 rounds of ammunition online in the weeks leading up to the massacre.

277.    Armslist negligently, recklessly, and/or intentionally facilitated the sale of vast quantities of guns in a manner that ensures a steady flow of guns in large quantities to the illegal secondary market - including criminals, juveniles, persons with criminal purposes and others prohibited by law from having guns, including but not limited to felons, those adjudicated mentally ill, and illegal traffickers.

278.    This flow was maintained both by direct sales to Prohibited Persons and sales to gun traffickers like Johnson.

279.    These purchasers, in turn, put guns in the hands of New England gang members, drug dealers and repeat felons like Headley, who are specifically prohibited by federal law from possessing firearms.

280.    Armslist has negligently, recklessly and/or intentionally participated in creating and maintaining an unreasonable interference with the rights held in common by the general public, constituting a public nuisance under New Hampshire common law.

281.    Without limitation, Armslist's acts and omissions as alleged herein cause, create, and maintain substantial and unreasonable interference with the public's health, safety, convenience, comfort, and/or peace.

282.    By negligently, recklessly and/or intentionally facilitating vast quantities of gun sales in a manner that ensures a steady flow of guns in large quantities to illegal traffickers, who in turn put guns in the hands of New England gang members, drug dealers and repeat felons, Armslist substantially and unreasonably interferes with the public's safety, comfort and peace while using public facilities, including public highways and walkways.

283.    The public at large is substantially and unreasonably unsafe because of the presence of guns possessed by Prohibited Persons that were illegally sold and negligently supplied by Armslist.

284.    By negligently, recklessly and/or intentionally facilitating illegal gun sales, Armslist substantially and unreasonably interferes with the public's safety and in turn has created long-lasting harm.

285.    Countless members of the public are killed, wounded, or end up a victim of criminal acts each year as a result of illegal gun sales that were negligently, recklessly, and/or intentionally facilitated by Armslist.

286.    Armslist's acts and omissions as alleged herein have led to a substantial and unreasonable increase in the number of people in the general public who are killed or injured by illegally obtained guns.

287.    Armslist's practices, in addition to increasing the number of victims of unlawful violence, have also emboldened criminals to commit more crimes involving the threat of violence, have increased disturbances of the public order caused by Prohibited Persons who have used Armslist.com to illicitly arm themselves and have forced society to divert substantial law enforcement, medical and legal resources to the gun violence fueled by weapons supplied through Armslist.com.

288.    Armslist's creation and operation of Armslist.com remains an abnormally dangerous activity that imposes unreasonable costs on society.

289.    Furthermore, as alleged herein, prior to facilitating the transaction at issue, Armslist was aware that its website was enabling the sale of weapons used in violent crimes such as those used in several well-publicized murders like the 40-caliber handgun used in the 2011 murder of Jitka Vesel, and the weapon used in the 2012 mass casualty in Brookfield, Wisconsin.

290.    Armslist thus has actual or constructive knowledge that it designed and operated its online gun marketplace in a way that encouraged prohibited sales that unreasonably interfered with the general public's safety, peace and comfort.

291.    In addition to the generalized harms suffered by the public from the acts and omissions of Armslist, Armslist caused Officer Stokinger to suffer discrete personal injuries of a direct and substantial character other than that which the general public shares, and caused Officer Stokinger damages, including significant past and future pain, suffering, disability, emotional distress, and loss of enjoyment of life, lost wages, and other compensable injuries and damages, all of which exceed the harm Armslist's negligent acts and omissions cause the general public.

292.    Armslist's acts or omissions were wanton, malicious, and/or oppressive, which entitle the Plaintiffs to enhanced compensatory damages.

293.    The public nuisance caused by Armslist is substantial and ongoing and poses a continual threat to the public, meriting injunctive relief.

## COUNT IV:
(Loss of Spousal Consortium)

294.    Plaintiffs repeat and reallege the allegations set forth above in this Complaint as if fully set forth herein.

295.    Plaintiff Janella Stokinger is, and at all relevant times has been, the wife of Officer Stokinger.

296.    As a direct and proximate result of the negligent, reckless, and/or intentional acts of Armslist, Plaintiff Janella Stokinger has suffered a loss of spousal consortium, companionship, society, affection, services, support, advice, counsel, and physical intimacy.

297.    As a direct and proximate result of the negligent, reckless, and/or intentional acts of Armslist, Plaintiff Janella Stokinger endured pain and suffering, lost wages, companionship, comfort, guidance, counsel and advice of her husband, Officer Stokinger.

298.    As a direct and proximate result of the negligent, reckless, and/or intentional acts of Armslist, Plaintiff Janella Stokinger has had to assume many of the duties that normally would have been assumed by her husband, Officer Stokinger, including, but not limited to, child care duties and household duties, all to her damage in an amount to be determined at a trial of this matter.

299.    Armslist's acts or omissions were wanton, malicious, and/or oppressive, which entitle the Plaintiffs to enhanced compensatory damages.

<u>COUNT V:</u>
(Loss of Support)

300.    Plaintiffs repeat and reallege the allegations set forth above in this Complaint as if fully set forth herein.

301.    Plaintiff Janella Stokinger is, and at all relevant times has been, the wife of Officer Stokinger, and has been dependent on Officer Stokinger for his support and maintenance.

302.    Until January 8, 2016, Officer Stokinger had been an able-bodied and decorated nine-year veteran of the Boston Police Department, where he worked regularly and had reasonably and properly supported Janella Stokinger.

303.    As a direct and proximate result of the negligent, reckless, and/or intentional acts of Defendants, Janella Stokinger has been deprived of the regular and reasonable support and maintenance that she had previously received from her husband, Officer Stokinger.

304.    As a direct and proximate result of the negligent, reckless, and/or intentional acts of Defendants, Janella Stokinger will be permanently damaged and will in the future be deprived of

the financial support and aid previously received from her husband, Officer Stokinger, because of his permanent injuries and inability to work as a police officer, all to her damage in an amount to be determined at a trial of this matter.

305.    Armslist's acts or omissions were wanton, malicious, and/or oppressive, which entitle the Plaintiffs to enhanced compensatory damages.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment as follows:

(i)     For compensatory damages in an amount to be determined at a trial of this matter;

(ii)    For enhanced compensatory damages based on the wanton, malicious, or oppressive acts or omissions of Armslist;

(iii)   For any and all equitable relief that may be justified;

(iv)    Reasonable costs and attorneys' fees; and

(v)     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable of no less than twelve (12) jurors.

KURT and JANELLA STOKINGER
By and Through Their Attorneys,

MCDOWELL & MORRISSETTE, P.A.

Dated: September 12, 2023

By: */s/Mark D. Morrissette*
Mark D. Morrissette, Esq., NH Bar No. 10033
By: */s/Brian J. Stankiewicz*
Brian J. Stankiewicz, Esq., NH Bar No. 276345
282 River Road
Manchester, NH 03105
(603) 623-9300
mmorrissette@mcdowell-morrissette.com
bstankiewicz@mcdowell-morrissette.com

BRADY CENTER TO PREVENT GUN
VIOLENCE
By: */s/Douglas N. Letter*
Douglas N. Letter, Esq., DC Bar No. 253492
By: */s/Erin Davis*
Erin Davis, Esq., NC Bar No. 36173
By: */s/Jenna Tersteegen*
Jenna Tersteegen, Esq., NY Bar No. 5574405
*Pro Hac Vice Application Pending*
840 First Street NE, Suite 400
Washington, DC 20005
(202) 370-8100
dletter@bradyunited.org
edavis@bradyunited.org
jklein@bradyunited.org

BLANK ROME LLP
By: */s/John D. Kimball*
John D. Kimball, Esq., NY Bar No. 1416031
By: */s/Martin S. Krezalek*
Martin S. Krezalek, Esq., NY Bar No. 4719142
By: */s/Robin L. Michaelson*
Robyn L. Michaelson, Esq., NY Bar No. 5323944
*Pro Hac Vice Applications Pending*
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000
john.kimball@blankrome.com
martin.krezalek@blankrome.com
robyn.michaelson@blankrome.com