# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                         SUPERIOR COURT DEPARTMENT
                                                    CIVIL ACTION NO: 1884CV03236-F

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
KURT    STOKINGER    and    JANELLA :
STOKINGER,                                          :
                                                    :
                    Plaintiffs,                     :
                                                    :
         -against-                                  :
                                                    :
ARMSLIST, LLC, GRANT HEADLEY, and :
SARA JOHNSON,                                       :
                                                    :
                    Defendants.                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
-

### FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiffs Kurt Stokinger ("Officer Stokinger") and Janella Stokinger (collectively, "Plaintiffs"), by their attorneys, for their complaint against Armslist, LLC ("Armslist"), Grant Headley ("Headley"), and Sara Johnson ("Johnson," collectively, "Defendants"), upon information and belief, allege as follows:

### NATURE OF THE ACTION

1.      Armslist negligently and deliberately created an online firearms marketplace by which dangerous people could illegally buy and sell guns.

2.      Armslist's negligence directly, foreseeably, and proximately caused a police officer to be shot by enabling a known drug dealer and convicted felon to illegally purchase a gun he could not legally obtain.

1

3.      On the morning of January 8, 2016, in the Dorchester neighborhood, Officer Stokinger, a decorated nine-year veteran of the Boston Police Department, was shot in the leg with a .40 caliber Glock Model 27 semi-automatic handgun.

4.      The shooter, Grant Headley ("Headley"), was a drug dealer whom Officer Stokinger engaged as part of an investigation by the Mattapan Neighborhood Drug Control Unit.

5.      Officer Stokinger is lucky to be alive. He survived the shooting thanks to his fellow officers' quick reaction in applying a tourniquet to control the bleeding. Plus a bit of good fortune. Headley ran towards Officer Stokinger while continually firing at him. He was able to fire off five rounds before his gun jammed, leaving a live round stuck in the chamber, and seven more potentially deadly rounds in the magazine.

6.      Headley should not have had a gun. He was an armed career criminal. On the day he opened fire on Officer Stokinger, Headley was on probation after serving the full five-years of his prison sentence for a 2009 drug possession and unlawful possession of a firearm conviction.

7.      Since Federal law prohibits anyone ever convicted of any felony from ever possessing a firearm, Headley's criminal history prevented him from legally purchasing or possessing a gun.

8.      However, Armslist.com, the online firearms marketplace owned and operated by defendant Armslist, enabled Headley to easily get one on the street from Johnson, a gun runner who purchased her wares through Armslist.com.

9.      Armslist.com facilitates illegal firearms sales and purchases.

10.     Armslist chose to establish an online firearms marketplace when it was well aware of the grave, foreseeable risk that it would arm criminals and facilitate illegal acts.

2

11.     Indeed, Armslist established Armslist.com when numerous other companies had ceased having anything to do with internet gun purchases, because the risk was too great that prohibited and other dangerous people would be able to violate and circumvent the law, obtain guns, and use them to injure or kill innocent people.

12.     While other online gun companies have instituted safeguards to make it more likely that guns are sold legally and responsibly, Armslist has done the opposite.  Intentionally entering into this risky environment, Armslist chose to establish an online firearms marketplace which facilitated sales to illegal purchasers and did not include reasonable safeguards to minimize the risks of illegal and dangerous conduct.

13.     Armslist willfully created a website that attracts and facilitates illegal and dangerous persons to buy, sell and obtain guns.

14.     Since Armslist established its website, studies and news has made Armslist even more aware that its online marketplace is a haven for prohibited purchasers, illegal gun sellers, and the cause of significant shootings, gun crimes, and murder.

15.     Armslist's response has been to continue and maintain the dangerous online marketplace it created, and refuse to institute safeguards.

16.     Armslist created and employs a series of website design features that offer illegal gun purchasers and sellers a smorgasbord of opportunity to purchase and sell firearms without having to undergo a background check or leaving any record.

17.     What is more, in this instance, Armslist facilitated more than just an isolated private sale.  Armslist's negligence directly enabled a gun trafficking operation which allowed Headley (and other dangerous criminals) to purchase a gun in spite of the prohibitions and safeguards aimed at preventing him from legally possessing firearms.

3

18.     Sara Johnson, who illegally and negligently sold the gun to Headley, purchased scores of firearms on Armslist.com for the very purpose of reselling those guns to drug dealers, gang members, and other persons unable to purchase guns through legal channels.

19.     Armslist designed and operated its online marketplace so as to permit and directly assist this very sort of scheme.

20.     In addition to Johnson's negligence in selling a deadly firearm to a dangerous felon, which was a direct and proximate cause of the injuries to Officer Stokinger, Armslist's actions were also a direct and proximate cause of the injuries to Officer Stokinger.

21.     The shooting of Officer Stokinger was a foreseeable result of Armslist's negligent conduct.

22.     Through its design, content creation, and systematic operation of Armslist.com's website features, all of which amount to the facilitation of an anonymous gun marketplace resulting in the supplying of illegal, unlicensed firearms dealers and transactions having no record, Armslist negligently enabled precisely the kind of user activity that allowed Johnson to circumvent the law by engaging in drug trafficking and negligently selling Headley the Glock 27 he used to shoot Officer Stokinger.

## JURISDICTION AND VENUE

23.     Jurisdiction is properly conferred by G.L. c. 212, § 4 and c. 223A, § 3.

24.     Venue is proper under G.L. c. 223, § 1.

## THE BASIC FACTS

**A.      Internet Firearm Transactions by Unlicensed Sellers.**

25.     Armlist is aware -- and has been aware since it opened its business -- that it caters to people who seek to circumvent federal and state laws that keep guns out of dangerous hands.

4

26.     Federal law recognizes that because firearms are lethal weapons that are sought after and used by dangerous people to harm innocent people, firearms possession and sale are restricted. Only certain categories of people are allowed to possess and buy firearms, and federally-licensed dealers are allowed to engage in the firearms business.

27.     Federal firearms law prohibits guns from being possessed by felons, the mentally ill, domestic abusers, minors, and other prohibited purchasers (collectively, "Prohibited Purchasers").

28.     To ensure that these Prohibited Purchasers do not obtain guns, federal law requires that only approved and federally-licensed firearms dealers may engage in the business of dealing in firearms.

29.     Before engaging in the gun business, a person or entity must apply for and be granted a federal firearms license ("FFL") from the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

30.     Federally licensed firearms dealers are subject to regulations and obligations to ensure that guns are kept out of the hands of dangerous people.

31.     FFLs are required to conduct background checks on gun buyers, and must keep records of firearms sales to help law enforcement investigate firearms crimes and monitor dealers.

32.     Dealers also must abide by other laws and regulations, including informing law enforcement whenever a purchaser engages in a multiple sale, that is, buying more than one handgun within five business days, which may indicate firearms trafficking.

33.     Dealers are recognized as primary agents of law enforcement, and have a duty to screen for suspicious sales, and refuse sales where they have any doubt that the sale may be too dangerous or risky, even if the buyer would pass a background check.

5

34.     In enacting this scheme by which licensed dealers sell firearms, Congress recognized and sought to address the inherent danger to the public posed by certain individuals possessing firearms.

35.     Conversely, unlicensed "private sellers" are supposed to only sell the occasional gun but not be in the business of selling firearms.

36.     In Massachusetts, an unlicensed seller may only sell a maximum of four firearms in a year.

37.     Most notably, private sellers are not required under Federal law to conduct background checks.

38.     Private sellers who sell within their state are not required to keep a record of the transaction.

39.     Background checks are a critical part of screening individuals to determine their suitability for gun ownership.

40.     Over the years, since the Brady Law requiring that FFLs submit purchasers to a background check was enacted in 1994, there has been growing recognition that a significant portion of firearms business in the United States is engaged in by unlicensed private sellers who are not required to use background checks.

41.     Nineteen states and Washington DC have extended their background check requirement beyond Federal law to apply to at least some private sales, thereby closing the Federal private sale loophole.[1]   However, the Federal law loophole allows private sellers who are not

---

[1] Nine states (California, Colorado, Connecticut, Delaware, Nevada, New York, Oregon, Rhode Island, Washington) and Washington, DC require universal background checks at the point of sale for all sales and transfers of any class of firearms, whether they are purchased from a licensed or unlicensed seller. Two states, Maryland and Pennsylvania, require point of sale background checks for handguns but not rifles and shotguns. Four states (Hawaii, Illinois, Massachusetts, and New Jersey) require all firearm purchasers to obtain a permit, issued after a background check, to buy any firearm. Finally, four states (Iowa, Michigan, Nebraska, and North Carolina) require all firearm purchasers

6

engaged in the firearms business (in the thirty-one states that have no background check requirement) to sell firearms without performing any background check whatsoever. As a result, convicted felons, domestic abusers, and other persons who are recognized as too dangerous to possess guns, can obtain guns from sales without background checks.

42.     For years, there has been growing recognition that many private unlicensed sellers are illegally engaged in the business of selling firearms without a license that enables them to do so.

43.     As multiple and repeat firearms purchases are a known indicator of potential illegal gun trafficking, federal law requires that licensed dealers report "multiple sales" to ATF, that is when a purchaser buys more than one handgun in five business days.

44.     Private sales are attractive to buyers wishing to avoid a record of their purchases, and buyers who fear they will fail a background check.

45.     Private sales, which have been occurring on the internet at an ever-increasing rate, account for about a quarter or more of all U.S. sales and fuel the black market for illegal guns.

46.     In a 2017 published gun trace report, the city of Chicago noted that the number of guns available on Armslist.com had jumped from 12,000 to 148,000 — a twelve-fold increase — since 2011.

47.     Private sales conducted over the internet have frequently been linked to illegal gun trafficking and sales to minors.

48.     Internet sales, including when the transfer is made by a licensed dealer, have also been connected to several well-documented mass shootings, including the 2007 shooting at

---

to obtain a permit, issued after a background check, to buy handguns, but not rifles and shotguns. Illinois also requires a point of sale background check whenever a firearm is sold at a gun show.

Virginia Tech, which killed 32 people and left over a dozen wounded, and the 2008 shooting at Northern Illinois University, where 5 were killed and 17 more were wounded.

**B.     Armslist.com.**

49.     Armslist.com is a for-profit web-based online firearms marketplace which enables individuals to privately purchase and sell firearms and firearm-related accessories.

50.     Armslist, which owns and operates Armslist.com, is not licensed as a federal firearms dealer.

51.     The company is funded through paid advertisements on Armslist.com.

52.     Armslist created Armslist.com after several prominent online marketplaces chose to stop facilitating online firearm sales (*i.e.*, "private sales") due to the danger of proliferation of illegal online gun sales.

53.     In 2002, eBay, the multibillion dollar online auction and trading community announced that it was prohibiting gun sales on its website.  The company's decision to end the user listing of firearms was rooted in the belief that the internet "*was not an appropriate venue for that kind of merchandise*," because "*the process of buying and selling firearms online is sufficiently different from the offline world*."  Specifically, in defending eBay's decision to prohibit firearm sales, the company's then-vice president of marketing and business development, cited the fact that "*online sellers cannot readily guarantee that buyers meet all the qualifications and comply with the laws governing firearm sales*."

54.     In or around 2007, Craigslist, the ubiquitous classified advertisements website, also banned firearm sales from its site.

55.     Other online websites that facilitate online sales by private parties, including Amazon.com's third-party seller program, which enables individuals and businesses to sell their

8

products and inventory on Amazon.com, and Google's "AdWords" ad serving platform, which serves ad copy and product listings to millions of websites internationally, similarly prohibit the listing of firearms for sale because of the high likelihood that such sales will funnel guns to the criminal market.

56.     These online market providers' responsible decisions to prohibit their users from using posts to facilitate firearms transactions created a considerable void in the firearm private seller eCommerce market for those buyers and sellers wishing to illegally buy and sell guns online. Enter Armslist.

57.     Despite the known risks and inherent danger in creating a new platform devoted to enabling private seller transactions, Armslist was happy to capitalize on this commercial opening and fill the void.

58.     Armslist.com's co-founder Jon Gibbon explained his rationale as follows: "*Sometime during the Summer of 2007, I saw an interview about Craigslist.com on TV. When I heard them say that they decided to ban all gun related ads because a few users cried out for it, it inspired me to create a place for law abiding gun owners to buy and sell online without all of the hassles of auctions and shipping.*"

59.     Armslist.com is well aware that it primarily facilitates firearms sales without background checks by self-identified "private sellers."

60.     A 2013 examination of Armslist.com postings by the New York Times revealed that 94% of the ads on the site were posted by private sellers. Thus, Armslist's ad sale revenue is almost entirely supported by the traffic of background check-less gun sales.

61.     Armslist knew, or should have known, that by launching the Armslist.com platform it would be facilitating the very-sort of illegal firearm sales that eBay, Craigslist, and other

9

prominent eCommerce marketplaces sought to eliminate by prohibiting *all* gun sales on their platforms.

62.     It is not difficult for law-abiding gun buyers to find a licensed gun dealer by which to buy guns legally in the United States.

63.     Gun stores are ubiquitous in America, with over 64,000 across the country, more than McDonald's, coffee shops, grocery stores, pharmacies, or 7-11s.

64.     Many licensed gun dealers also maintain websites by which people can order firearms online and have them shipped to a local firearms dealer to transfer to them.

65.     These licensed dealers provide a wide variety of firearms, many of them new and in the box, often backed up by warranties and service, as well as recommended accessories and other products that are of interest to many law-abiding gun owners.

66.     As licensed dealers may buy firearms at wholesale, they generally offer lower prices than unlicensed sellers for the same product.

67.     Private unlicensed sellers offer far less variety of firearms and other products, and usually no service or warranties to back up the product.

68.     Private unlicensed sellers often sell used products of questionable quality, and those guns are often sold at higher prices than at dealers.

69.     Most, if not all, law-abiding gun buyers would prefer more selection, more service, higher quality, and lower prices.

70.     However, because private sellers do not require a background check before selling guns, and are not required to maintain records of sales, they are attractive to people whose highest priority is avoiding a background check and records.

10

71.     Further, several online gun marketplaces provide at least some safeguards against transacting with Prohibited Purchasers and gun traffickers, such as requiring transfers at licensed dealers.

72.     Numerous responsible and law abiding gun owners purposefully avoid using Armslist.com because of the inherent risks that run with posting on Armslist.com.

73.     Armslist created a marketplace tailored in part to attract persons who wish to buy or sell firearms in a way that circumvents federal and state gun laws.

74.     In April 2016, Timothy Cassinger of Ohio pleaded guilty to the illegal sale of 300 guns over a three-year period. When the Bureau of Alcohol, Tobacco, Firearms and Explosives interviewed him, Cassinger admitted he sold guns on Armslist.com, saying he didn't need to create an account to advertise there and the site only asked for a minimal amount of personal information. Some of the guns that Cassinger trafficked through Armslist ended up in the Middle East, and others were recovered by police during criminal investigations in Cleveland, Columbus, New York City and other cities.

C.     **Armslist.com's Design Features Facilitate Illegal Firearm Purchases.**

75.     Armslist designed its website to facilitate illegal firearms purchases and sales.

76.     Armslist also designed Armslist.com to enable anyone to buy guns via the website.

77.     Armslist did not include any measures to prevent prohibited persons from using its website or buying guns through it.

78.     Even though only licensed persons are allowed to engage in the firearms business, Armslist designed Armslist.com to enable anyone to engage in the firearms business via its website, even if they do not have a license that allows them to do so.

11

79.     Armslist did not include any measures to prevent illegal gun sellers persons from using its website to illegally sell guns, or to buy guns to illegally sell.

80.     Armslist.com was created to enable any person with access to a computer or a smart phone who wishes to buy or sell a gun to do so, by locating gun buyers and gun sellers either by clicking on a link within the website, or by using the contact information provided by the other party through the website.

81.     Armslist.com has tens of thousands of guns listed, with no fees, no auctions, and essentially no rules.

82.     Armslist designed Armslist.com to exploit and profit from the background check exception for private sellers, to enable the sale of firearms to prohibited and otherwise dangerous people, and to enable illegal firearm sales and illegal firearms dealing by unlicensed persons, including sales that avoid federal restrictions on interstate transfers, state-imposed waiting periods, and state-specific assault weapon restrictions, and the regulations on licensed dealers.

83.     Through its willful creation, maintenance, and employment of website content and design features that facilitate anonymous illegal firearms purchases, Armslist.com enables the kind of illegal gun trafficking in which Johnson engaged and Headley exploited.

84.     Critically, Armslist designed its website so that a buyer need not open an account in order to purchase a firearm through Armslist.com.

85.     The FAQ page of the website informs its users that: "*You can perform all of the major functions without creating an account.*"

86.     Unlike some of its competitors' sites, Armslist.com is designed to allow prospective purchasers to browse ads without identifying themselves and to contact sellers via the website's internal e-mail system without leaving any public record.

87.     Ultimately, the parties may complete their transaction completely anonymously, thereby minimizing the collection of evidence that could be used to hold them accountable for later unlawful acts committed with an identified firearm.

88.     Armslist's provision of complete anonymity poses an inherent and foreseeable danger that Prohibited Persons and gun runners engaging in firearm sales without a license will utilize Armslist.com in order to buy firearms with no paper trail and no questions asked.

89.     Another dangerous design feature created by Armslist is that Armslist.com allows potential purchasers to filter to browse only guns being sold by a "Private Party," or, in other words, limit the search to private sellers who are not required to conduct background checks.



90.     As the FAQs explain: "*there are a number of features that enable you to filter out vendors. On the category selection page, there are links that allow you to view 'private party' or 'dealer' versions of the category. Additionally, on the category listings page, there are filters on the left side of the screen that allow you to toggle 'private party', 'vendor', or 'all sellers.'*"

13

91.     Given that licensed dealers often provide higher quality, greater selection, more service, at lower prices, this "private" seller search function created by Armslist aims to serve people whose priority is avoiding background checks and record-keeping and other regulations of gun sales, either because they are prohibited from possessing guns, or wish to avoid law enforcement detection.

92.     Additionally, through its "Location" filter, Armslist.com allows the purchaser to filter by "State," thereby permitting buyers to focus only on the thirty-one states that have no background check requirement. Hence, a search filtered to return only postings by (1) a "*Private Party*," (2) who is located in one of the states that has not closed the Federal private sale loophole, enables buyers, including gun runners and dangerous felons, to ensure that they will not have to undergo a background check.

93.     A buyer in Massachusetts, for example, can evade state law requirements – such as Massachusetts requirement that a firearms owner have a state license before buying a gun – by finding a "private" seller in another state.

94.     Nor does Armslist.com require that a purchaser take delivery of a gun through a licensed dealer who, by law, would have to maintain a record of the transaction, a constraint that would deter and greatly minimize the chances of firearm sales to Prohibited Purchasers and gun traffickers like Johnson because Prohibited Purchasers and gun traffickers would be deterred from engaging in recorded gun transactions.

95.     In fact, Armslist.com makes clear to buyers and sellers online that it will do nothing to enforce the law or reasonable, responsible practices, by informing users that it "*cannot and will not be a party in transactions*," and that "*[i]t is the sole responsibility of the buyer and seller to conduct safe and legal transactions*."

14

96.     Armslist places the obligation to vet purchasers and screen for potentially nefarious or illegal transactions entirely on its users.

97.     In fact, Armslist communicates to users that the Armslist.com marketplace is a secret place, in which Armslist will do nothing to ensure that laws are followed, not violated or subverted.

98.     Armslist informs users that it does not investigate whether purchasers are using Armslist.com "*for any illegal purpose*," and informs its users that the company "*does not certify, investigate, or in any way guarantee the legal capacity of any party to transact*."



**TERMS OF USE**

1. I am 18 years of age or older.
2. I understand that ARMSLIST DOES NOT become involved in transactions between parties and does not certify, investigate, or in any way guarantee the legal capacity of any party to transact.
3. I am responsible for obeying all applicable enforcement mechanisms, including, but not limited to federal, state, municipal, and tribal statutes, rules, regulations, ordinances, and judicial decisions, any applicable Presidential Executive Orders, including compliance with all applicable licensing requirements.
4. I will not use Armslist.com for any illegal purpose.
5. If I am at all unsure about firearm sales or transfers, I will contact the Bureau of Alcohol, Tobacco, Firearms, and Explosive at 1-800-ATF-GUNS and visit the ATF website at http://www.atf.gov.

99.     However, while putting the onus on the sellers to vet their buyers, Armslist provides no mechanism for the sellers to become informed about whom they are selling to.

100.    Since purchasers can be anonymous, and do not need to register on Armslist.com, a seller has no way to examine a potential buyer's purchase history on Armslist.com to determine whether any red flags exist that would deter the seller from transacting with that purchaser.

15

153467.06501/110534977v.4

101.  In particular, there is no way for a seller to find out whether a purchaser has made (or is making) numerous gun purchases in a short period of time, something that could indicate the purchaser is illegally dealing in firearms without a license, and likely would prevent most reasonable gun sellers from selling a gun to that person.

102.  Armslist's risk management with respect to potentially nefarious transactions is limited to requiring its users to click an acceptance of its "Terms of Use" stating that they will not use Armslist.com for any illegal purpose.

103.  In choosing to be completely hands-off in the transaction process, Armslist willfully provides a platform that enables the circumvention of federal and state gun laws by gun sellers, buyers, and re-sellers.

104.  Further, as Armslist knows or should know, much of Armslist's customers are illegal gun sellers.

105.  Nearly one in three gun ads on Armslist.com are posted by high-volume unlicensed sellers, many of whom are likely "engaged in the business" of selling firearms (*i.e.*, not really "private sellers") in violation of federal law.

106.  Such high-volume online sellers transfer tens of thousands of firearms each year, blurring the line between private sellers and licensed dealers, undermining the background check system, and putting guns in the hands of killers.

107.  Armslist could:

    (a)    limit the number of guns that can be sold on its website by a user;

    (b)    limit the number of guns that can be bought on its website by a user;

    (c)    require that sellers register and provide information about themselves and their firearms business;

16

(d)     implement a host of other measures that would prevent illegal gun dealing on its website, and detect when illegal gun dealing is taking place, either selling by illegal gun dealers, or buying inventory for illegal gun dealing.

108.     Instead, Armslist does nothing to monitor or weed out high-volume sellers purporting to be private "casual" sellers, or to limit sales and purchases in any way.

109.     Yet another significant design feature created by Armslist that facilitates illegal transactions is that Armslist.com does not allow flagging of criminal or illegal content.

110.     While users are allowed to "flag" ads to invite "review and policing" by Armslist, the website expressly prevents users from flagging content as purportedly criminal or illegal.

111.     Nor does Armslist provide the option for a seller to report any potentially illegal activity (such as apparent illegal gun dealing, or straw purchases) that the seller may suspect or encounter during an Armslist.com-facilitated transaction.

112.     Armslist has chosen not to provide any mechanism to receive information from its users that raises serious concerns about a particular purchaser's motives and patterns, and that would enable the company to prevent such user from using Armslist.com to violate laws or purchase additional guns.

113.     In making its website design decisions and content, Armslist chose not to include features and content that are feasible and many of which are used in other websites, often with far less dangerous activities or products.

114.     For example, Armslist created Armslist.com so that, among other things:

(a)     Users who were prohibited from buying or possessing guns (including felons, domestic abusers, minors, the dangerously mentally ill) could illegally buy and possess

17

guns. Armslist could have limited its site to lawful gun owners, but chose to make it easily accessible to illegal gun owners as well.

(b)    Users who could not pass a Brady background check, or wished to avoid recordkeeping or detection, could buy guns without a background check or any records of sale.

(c)    Users who lived in states with additional safety laws (including requiring background checks or licenses) could easily avoid and subvert those laws. Armslist could have limited users to local, in-state transactions, but chose to easily enable state laws to be subverted.

(d)    Users who were buying numerous guns to illegally sell with them without a license could do so without limit, and without notifying law enforcement when multiple handguns were purchased. Armslist could have prohibited illegal gun dealing on its site, and taken measures to stop it, but chose to easily enable illegal gun dealers.

(e)    Users who were selling numerous guns to illegally deal in firearms without a license could do so without limit. Armslist could have prohibited illegal gun dealing on its site, and taken measures to stop it, but chose to easily enable illegal gun dealers.

(f)    Users who wished to sell guns responsibly and legally did not have information about the person to whom they were selling or from whom they were buying, and were not provided laws and best practices. Armslist could have provided this information to users, but chose to maintain anonymity, secrecy, and ignorance.

(g)    Users who wished to flag suspicious and illegal conduct could not do so. Armslist could have provided users the means to flag dangerous conduct, but chose not to.

(h)    Users were assured that Armslist would do nothing to enforce the law, and would keep all transactions anonymous and private. Armslist could have informed users that it would take measures to enforce the law and was committed to keeping guns out of the hands of

18

dangerous people, but it chose not to do so, even after learning with certainty that its website was enabling illegal gun purchases, sales, and shootings.

115. Armslist.com's above-referenced website design features, filtering opportunities, and overall business model exist to enable Prohibited Purchasers and other dangerous persons who seek to avoid records of gun sales to buy guns from private sellers entirely under the radar and without a background-check, and for illegal gun sellers to supply them.

116. It was all the more foreseeable to Armslist that a criminal like Headley would obtain a firearm through Armslist.com because, long-prior to the transaction that resulted in Officer Stokinger's shooting, Armslist was aware that it was enabling felonious and otherwise illegal transactions. Indeed, by that time, several comprehensive studies and reports had already revealed that Prohibited Purchasers were attracted to Armslist.com due to its anonymity and the fact that no account registration was required.

117. A 2011 undercover investigation of illegal online gun sales conducted by the City of New York found that 62% of all private gun sellers agreed to sell a firearm to a buyer who said that he probably could not pass a background check. The study found that, in particular, 54% of Armslist.com's sellers were willing to make a sale to purchasers who they believed could not pass a background check. The results of this investigation were widely reported in the mainstream press.

118. In 2013, Mayors Against Illegal Guns, a bipartisan group of U.S. mayors, examined sales on Armslist.com and found that the website created a massive, unregulated internet weapons market where thousands of guns were illegally offered for sale by unlicensed firearms dealers. The "*investigation of high-volume online sellers show[ed] that hundreds of gun sellers were using the internet to transfer tens of thousands of firearms each year, blurring the line between private*

19

*sellers and licensed dealers, undermining the background check system, and putting guns in the hands of killers.*"

119.    In particular, the Mayors Against Illegal Guns report revealed that one in thirty "Want-To-Buy" ads on Armslist.com were posted by someone with a criminal record that barred them from owning a gun, more than quadruple the rate at which prohibited gun buyers were trying to buy guns at brick-and-mortar stores.

120.    Armslist is easing the flow of weapons into major cities and allowing sellers and buyers on the site to entirely skirt local gun regulations.

121.    In April 2015, Mayor Bill de Blasio and New York City's Department of Consumer Affairs Commissioner announced an investigation into the possible illegal and unlicensed sale of secondhand guns in New York City and issued a subpoena to Armslist. The New York Times examined private gun transactions at Armslist.com, and repeatedly found felons buying or selling guns. The Times concluded, "Armslist and similar sites function as unregulated bazaars, where the essential anonymity of the Internet allows unlicensed sellers to advertise scores of weapons and people legally barred from gun ownership to buy them."[2]

122.    In March 2018, California convicted felon Rafael "Ralphie" Sanchez was charged in federal court in connection with an Armslist gun trafficking scheme. Sanchez would choose guns and ammunition, including AR-15 rifles and high-capacity magazines, being offered for sale via Armslist by sellers in Tennessee, where no background check is required for private gun sales. Once Sanchez had the guns in hand, he would use Facebook's private messaging service to sell

---

[2] "Seeking Gun or Selling One, Web Is a Land of Few Rules," The New York Times, April 17, 2013

them with no questions asked to buyers in California, which requires background checks for all gun purchases.[3]

123.    Prior to facilitating the transaction at issue, Armslist was aware that its website was enabling Prohibited Purchasers to commit horrific murders.

124.    Several guns that were used in well-publicized (and heavily-litigated) murder incidents were purchased through Armslist.com.

125.    The 40-caliber handgun used in the 2011 murder of Jitka Vesel in Oak Brook, Illinois was purchased illegally by her killer, Demetry Smirnov, on Armslist.com. Smirnov was an immigrant from Russia living in Canada when he made the purchase (*i.e.*, a Prohibited Purchaser because private sellers are restricted to selling guns in-state only).

126.    A gun purchased through Armslist.com was also used in a 2012 mass casualty shooting at a spa and salon in Brookfield, Wisconsin. The shooter, Radcliffe Haughton, purchased the FNP-40 semiautomatic handgun and ammo on Armslist.com. He used that gun to kill his estranged wife Zina Daniel Haughton and two other people. Haughton was able to buy the gun illegally despite the fact that a restraining order against him for his history of domestic violence rendered him a Prohibited Purchaser.

127.    Accounts of fatal shootings tied to guns transacted through Armslist have continued through recent years.

128.    In approximately June 2016, a Washington, D.C. man sold a 29-year-old former Marine an AK-47 in a parking lot that he used to kill himself about two weeks later. Isaiah Janes, the former Marine, had been involuntarily committed to a psychiatric facility. As a result, he was prohibited from possessing a weapon. Janes had earlier attempted to buy a 12-gauge shotgun at a

---

[3] "FBI: TN is Gun 'Source State' for Calif. Felon," Knoxville News-Sentinel (Tennessee), April 11, 2018

21

gun store, but did not pass the required background check and was identified as a prohibited possessor. The seller, Richard Wince, had posted almost 400 listings on two online firearms websites, including Armslist, for trade or sale over a four-year period. Wince supplied weapons to other people who couldn't buy them legally; another gun was used in a murder in Washington.[4]

129.    On February 13, 2018, Chicago Police Commander Paul Bauer was fatally shot by a four-time felon who had obtained a Glock 9 mm handgun most recently listed on Armslist. A private seller named Thomas Caldwell had sold the gun in 2017 to a purchaser in Milwaukee with a felony arrest record. A subsequent investivation revealed that Caldwell had posted over 200 ads for gun sales on Armslist.com. Bauer was the highest-ranking Chicago officer to die in the line of duty in nearly 30 years.

130.    In May 2018, federal prosecutors in Chicago filed a criminal complaint against three men on charges they trafficked approximately 90 weapons from Kentucky to Chicago. Many of the guns were purchased from Kentucky sellers advertising on Armslist.com, and then resold to gang members in Chicago at a steep markup.  Prosecutors alleged that even though the defendants — Christopher Henderson, of Louisville, KY, John "JoJo" Phillips, of west suburban Hillside, IL and Jaiqail Wright, of Chicago — had ties to a violent faction of the Conservative Vice Lords street gang, they were able to secure an arsenal of weaponry with relative ease from Armslist.com sellers, including assault rifles, "Draco-style" machine pistols and guns with drum magazines capable of holding up to 100 rounds. A 9mm Taurus posted for sale on Armslist.com was bought by one of the defendant traffickers outside of a Louisville, KY outlet mall and used just 42 days later in an April 2017 drive-by shooting of Xavier Soto, a 15-year-old boy in Chicago, who died from the gunshot injuries.

---

[4] "Cop Convicted of Illegal Gun Dealing Sold Weapon Used in Murder," CNN Wire, May 2, 2018.

22

131.    Armslist knew or should have known of all of these facts about the dangerousness, and deadliness, of Armslist's business model and website, and, in fact, Armslist knew or should have known far more about who is using its website, how it is being used, and who is being injured or killed as a result.

132.    Armslist was fully aware and on notice that it designed and operated its online gun marketplace in a way that encouraged prohibited sales with foreseeable dangerous and deadly consequences.   Nevertheless, Armslist maintained its dangerous website design and did nothing to address this problem.

**D.      Armslist Enabled the Gun Running Operation that Allowed Headley to Illegally Purchase the Glock 27.**

133.    In this instance, Armslist's conduct and website content facilitated more than just an isolated illegal gun sale. Armslist directly enabled a gun-running operation that put guns in the hands of several New England gang members, drug dealers and dangerous repeat felons like Headley.

134.    Headley's lengthy criminal record began with a conviction for carrying a gun without a permit when he was 17 years old.  A year later, Headley spent time in jail on another weapon charge.   Over the next decade, Headley was charged at least ten times with drug possession, drug dealing, and firearms. In 2009, Headley was sentenced to five-years in prison for even more serious felony drug and weapons charges.  He was released from prison in April 2015 and went right back to dealing drugs.  Because of his several convictions, Headley was prohibited from purchasing or possessing a firearm.

135.    The gun that Headley used to shoot Officer Stokinger was recovered near the scene of the shooting. The serial number on the Glock 27 had been obliterated, but the Boston Police Crime Laboratory was able to successfully restore the number and identify the gun.

23

136.    A subsequent investigation by the ATF indicated that the firearm was last purchased by Derek McNamara on March 3, 2015 from Black Op Arms in Claremont, New Hampshire, a federally licensed firearms dealer.

137.    McNamara informed the ATF Special Agent investigating the gun's purchase history that he sold the Glock 27 on Armslist.com for $460 to Johnson, a New Hampshire woman who contacted him through Armslist.com and said she was interested in purchasing his gun. McNamara met Johnson at a McDonald's restaurant in Warner, New Hampshire in July of 2015 and sold her the Glock 27. McNamara told the ATF Agent that during the transaction, Johnson had an unidentified male in her vehicle who never left the vehicle during the transaction.

138.    Daniel Ray Sullivan, a convicted felon, was frequently observed with Johnson, with whom he had two children.

139.    On July 26, 2017, Johnson and Sullivan were indicted in United States District Court in New Hampshire on firearms charges. Johnson was charged with supplying a number of the guns she bought on Armslist.com to Sullivan, who she knew to be a prohibited possessor. Both Johnson and Sullivan entered guilty pleas.

140.    In Sullivan's plea, he admitted to coordinating contacts to Armslist.com sellers via email and arranging meetings to purchase their guns with Johnson.

141.    Although Johnson's purchase history through Armslist.com would have revealed that Johnson made several gun purchases in a short period of time, since Armslist.com does not require registration and keeps no record of purchases, Armslist did not inform McNamara of any red flags that existed indicating that she was likely an illegal gun dealer.

142.    Upon information and belief, shortly after Johnson purchased the gun from McNamara, Johnson and/or Sullivan sold the Glock 27 to Headley. Johnson and/or Sullivan sold

24

Headley the gun despite knowing, or having reasonable cause to believe, that Headley was a Prohibited Purchaser and was likely to use the gun in a way that would create an unreasonable risk of harm to the public.

143.   The gun sold to Headley was one of an estimated 30 to 63 firearms purchased by Johnson through Armslist.com.

144.   According to the ATF Agent investigating her case, Johnson's gun-running operation involved purchasing numerous guns from private sellers she contacted through Armslist.com.

145.   She would meet her sellers in random parking lots to complete the cash transactions.

146.   At least four of the firearms purchased by Johnson were subsequently recovered on the streets of Greater Boston within seven months or less of Johnson purchasing them.

147.   When she purchased the firearms, the guns' serial numbers were apparently still intact. Johnson would then destroy the serial numbers before reselling the guns for a profit on the streets of Boston.

148.   The four firearms that the ATF recovered in Boston and traced back to Johnson all had their serial numbers obliterated.

149.   Johnson bought multiple guns from the same sellers, at least one of them also engaged in illegal gun trafficking.

150.   In February 2018, Johnson pleaded guilty to several federal firearms charges, including aiding and abetting possession of firearms by Prohibited Persons, resulting from the resale of guns which she purchased on Armslist.com.

25

151.   In a similar case and just six months prior, federal authorities raided the home of David Bosari, who like Johnson was also from Manchester, New Hampshire, and who was suspected of illegally selling guns he had bought on Armslist and other websites.

152.   Between September 2016 and February 2017, Bosari arranged transactions involving 20 firearms. In the same pattern, guns purchased online by Bosari were recovered in the possession of criminals or juveniles stopped by police in Massachusetts: a felon in Beverly Mass., a person facing a restraining order in Cambridge, Mass., a juvenile in Everett, Mass., and gang members in Chelsea, Mass.

   E.   Armslist Could Have, But Did Not, Take Measures to Prevent Illegal Sales.

153.   The 2013 Mayors Against Illegal Guns report, discussed above, enumerated several steps that Armslist could take to control the trafficking of guns to violent criminals and drug traffickers through its website, including, without limitation, (1) monitoring high-volume sellers and issuing direct warnings to sellers appearing to be engaging in the business of selling firearms without a license, and providing users with a tool to report repeat offenders to law enforcement, (2) requiring greater transparency from users, such as requiring both buyers and sellers to register and provide credit-card verified evidence of their identity before posting or purchasing through the website, (3) requiring sellers to conduct background checks on would-be gun buyers or, at a minimum, recommending that users conduct background checks and providing tools to facilitate such background checks.

154.   And as also discussed above, Armslist.com could require that any purchasers of guns from private sellers take delivery of their guns through a licensed dealer.  Doing so would deter Prohibited Purchasers and gun traffickers like Sara Johnson, seeking to avoid a record, from making purchases through Armslist.com.

26

155.    Some or all of these procedural safeguards, which reduce the opportunity for sellers to provide guns to anonymous and unchecked buyers, have been adopted by other online gun marketplaces, such as ShootersXchange.com, GunAuction.com, GunBroker.com, and GunRunnerAuctions.com.

156.    But to date, Armslist maintains its designed website and has done nothing to change the negligent design and operation of its online marketplace. Instead, Armslist is determined to exploit a status quo that has (1) demonstrably resulted in thousands of annual illegal gun purchases by dangerous criminals, (2) delivered the guns that were used in several high profile killings, and (3) enabled the illegal gun trafficking scheme that resulted in the shooting of Officer Stokinger.

### FIRST CAUSE OF ACTION
### (Assault and Battery Against Grant Headley)

157.    Plaintiffs repeat and reallege the allegations set forth above in this Complaint as if fully set forth herein.

158.    Headley intended to cause physical harm to Officer Stokinger.

159.    Headley acted to cause Officer Stokinger to reasonably believe that he had the present intent and ability to harm him by aiming his gun at him and repeatedly firing his gun in Officer Stokinger's direction.

160.    Headley intentionally caused physical bodily harm to Officer Stokinger by shooting him in the ankle.

161.    Officer Stokinger did not consent to the harm.

162.    As a result of this assault, as alleged, Officer Stokinger has suffered personal injuries and damages including significant past and future pain, fear of impending death, awareness of impending death, suffering, disability, emotional distress and loss of enjoyment of life, loss of

27

consortium, lost wages and impairment of future earning capacity, and other compensable injuries

and damages, all to his damage in an amount to be determined at a trial of this matter.

## SECOND CAUSE OF ACTION
### (Negligence Against Sara Johnson)

163.    Plaintiffs repeat and reallege the allegations set forth above in this Complaint as if

fully set forth herein.

164.    At all relevant times, Johnson was subject to the general duty imposed on all

persons not to expose others to reasonably foreseeable risks of injury. Johnson had a duty to

exercise reasonable care in selling guns and to refrain from engaging in any activity creating

reasonably foreseeable risks of injury to others.

165.    At all relevant times, Johnson owed a duty to the public, including Officer

Stokinger, to refrain from selling firearms to individuals who are clearly dangerous or prohibited

under state and federal law from possessing a firearm.

166.    Breach of the aforementioned duties constitutes negligence.

167.    Johnson knew or had reasonable cause to believe that Headley was a Prohibited

Purchaser and/ or was likely to use the Glock 27 in a way that would create an unreasonable risk

of harm to others, including Officer Stokinger.

168.    Johnson breached her duties by selling a firearm to Headley when she knew, or

reasonably should have known, that Headley was prohibited by law from purchasing or possessing

a firearm and/or was likely to use the Glock 27 in a way that would create an unreasonable risk of

harm to others, including Officer Stokinger.

169.    Because of Johnson's breaches of her duties, Headley, a Prohibited Purchaser, was

able to purchase the Glock 27 that he used to shoot Officer Stokinger. Headley's ability to

purchase the gun illegally from Johnson was a substantial factor in the shooting of Officer Stokinger.

170.     The shooting of, and injury to, innocent persons such as Officer Stokinger was a foreseeable result of Johnson's negligent conduct.

171.     As a direct and proximate result of Johnson's negligence, as alleged herein, Officer Stokinger has suffered personal injuries and damages including significant past and future pain, suffering, disability, emotional distress, loss of enjoyment of life, loss of consortium, lost wages, and other compensable injuries and damages, all to his damage in an amount to be determined at a trial of this matter.

## THIRD CAUSE OF ACTION
### (Negligence Against Armslist)

172.     Plaintiffs repeat and reallege the allegations set forth above in this Complaint as if fully set forth herein.

173.     At all relevant times, Armslist was subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury. Armslist had a duty to exercise reasonable care in creating and maintaining its marketplace for the sale of guns, and facilitating the sale of guns, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

174.     At all relevant times, Armslist owed a duty to the public, including Officer Stokinger, to operate its website, Armslist.com, in a commercially reasonable manner. As the operators of a website that creates a permanent, 24/7 marketplace for the private sale of lethal weapons among strangers, Armslist had a duty to use reasonable care, and not to enable and facilitate illegal gun sellers and buyers, as well as to design a website that complied with existing gun laws.

29

175. Breach of the aforementioned duties constitutes negligence.

176. Armslist intended the design of Armslist.com to facilitate illegal firearms sales and purchases, and Armslist either knew, or had reasonable cause to believe, that the design of Armslist.com would enable gun trafficking and facilitate sales of guns to Prohibited Purchasers like Headley.

177. Armslist breached its duties by, inter alia:

a) Designing Armslist.com to enable gun trafficking and facilitate sales to Prohibited Purchasers; and

b) Failing to provide any training, instructions, warnings or guidance to persons who would foreseeably use Armslist.com to sell firearms; and

c) Failing to employ reasonable design safeguards, including questioning, screening, warnings, instructions, and monitoring that would prevent illegal buyers and sellers from using its site, and prevent any user from violating the law or arming dangerous people, thereby facilitating sales to purchasers like Johnson, who was purchasing numerous firearms for the purpose of illegal resale to Prohibited Purchasers; and

d) Failing to require that purchasers take delivery of guns through licensed dealers legally required to maintain records of transactions which would deter gun traffickers like Johnson from using Armslist.com to supply their gun trafficking operations; and

e) Failing to provide mechanisms that would allow sellers to vet purchasers' purchase history so as to determine whether any red flags exist; and

f) Failing to allow users to flag potential criminal or illegal content or activity.

178. Because of Armslist's breaches of its duties, Johnson, a gun trafficker, was able to use Armslist.com for the purpose of funneling numerous firearms illegally to dangerous criminals. Johnson's Armslist.com-based gun trafficking operation was a substantial factor in the shooting of Officer Stokinger.

30

179.    Because of Armslist's breaches of its duties, Headley, a Prohibited Purchaser, was able to purchase the Glock 27 that he used to shoot Officer Stokinger. Headley's ability to obtain the gun illegally was a substantial factor in the shooting of Officer Stokinger.

180.    Given the design and operation of the Armslist.com website, which facilitates and allows gun trafficking and sales to Prohibited Purchasers, and given the previous horrific murders by persons using guns purchased illegally through Armislist.com, the shooting of, and injury to, innocent persons such as Officer Stokinger was a foreseeable result of Armslist's negligent conduct.

181.    As a direct and proximate result of Armslist's negligence, as alleged herein, Officer Stokinger has suffered personal injuries and damages including significant past and future pain, suffering, disability, emotional distress, and loss of enjoyment of life, loss of consortium, lost wages, and other compensable injuries and damages, all to his damage in an amount to be determined at a trial of this matter.

## FOURTH CAUSE OF ACTION
### (Aiding And Abetting Tortious Conduct Against Armslist)

182.    Plaintiffs repeat and reallege the allegations set forth above in this Complaint as if fully set forth herein.

183.    Armslist aided, abetted and acquiesced in Johnson's negligent sale of the Glock 27 that was used to shoot Officer Stokinger to Headley, a dangerous Prohibited Purchaser, in violation of 18 U.S.C. § 922(d), by, *inter alia*, providing substantial assistance to Johnson by brokering the anonymous transaction between Derek McNamara and Johnson, whereby Johnson purchased the gun. Armslist provided further substantial assistance to Johnson by shifting the responsibility of vetting purchasers to sellers like Derek McNamara, whom Armslist knew or should have known

31

would not have the resources and be unqualified to perform such vetting, and otherwise acting recklessly and negligently.

184.    Such conduct was in knowing violation of state and federal aiding and abetting statutes, which are applicable to the sale, marketing, and facilitation of the sale of firearms, and the violation was a cause of Officer Stokinger's harm.

185.    Armslist's conduct was negligent and reckless because, as a result of (a) several publicized incidents where Armslist.com was directly identified as the conduit that enabled Prohibited Purchasers to obtain weapons used in crimes, and (b) several comprehensive investigations and reports which concluded that Armslist.com was being actively utilized by criminals and other Prohibited Persons to obtain firearms, and utilized by high-volume dealers to avoid background checks by posing as private sellers, Armslist had knowledge that sellers and purchasers on Armslist.com were committing torts, including, without limitation, engaging in transactions that were in violation of 18 U.S.C. § 922(d).

186.    As a result of Armslist's aiding and abetting tortious conduct, as alleged herein, Officer Stokinger has suffered personal injuries and damages including significant past and future pain, suffering, disability, emotional distress, and loss of enjoyment of life; past and future medical expenses; past wage loss and impairment of future earning capacity, and other compensable injuries and damages, all to his damage in an amount to be determined at a trial of this matter.

187.    As a result of Armslist's aiding and abetting tortious conduct, as alleged herein, Officer Stokinger suffered personal injuries that resulted in damages including significant past and future pain, suffering, disability, emotional distress, and loss of enjoyment of life, loss of consortium, lost wages, and other compensable injuries and damages, all to his damage in an amount to be determined at a trial of this matter.

32

## FIFTH CAUSE OF ACTION
### (Public Nuisance Against Armslist)

188.    Plaintiffs repeat and reallege the allegations set forth above in this Complaint as if fully set forth herein.

189.    By negligently, recklessly, and/ or intentionally facilitating the sale of vast quantities of guns in a manner that ensures a steady flow of guns in large quantities to the illegal secondary market, criminals, juveniles, persons with criminal purposes and others prohibited by law from having guns, including but not limited to felons, those adjudicated mentally ill, and illegal traffickers, who in turn put guns in the hands of New England gang members, drug dealers and repeat felons like Grant Headley, who are specifically prohibited by federal law, Armslist has negligently, knowingly and/or intentionally participated in creating and maintaining an unreasonable interference with the rights held in common by the general public, constituting a public nuisance under Massachusetts common law and the law of the City of Boston.  Without limitation, Armslist's acts and omissions as alleged herein cause, create, and maintain substantial and unreasonable interference with the public's health, safety, convenience, comfort, peace, and use of public property and/or private property.

190.    By negligently, recklessly and/or intentionally facilitating vast quantities of gun sales in a manner that ensures a steady flow of guns in large quantities to illegal traffickers, who in turn put guns in the hands of New England gang members, drug dealers and repeat felons, Armslist substantially and unreasonably interferes with the public's use of public facilities, including the use of public highways and walkways.  Public highways and walkways are substantially and unreasonably unsafe because of the presence of guns possessed by prohibited persons that were illegally sold and negligently supplied by Armslist.

33

191.    By negligently, recklessly and/or intentionally facilitating illegal gun sales, Armslist substantially and unreasonably interferes with the public's safety and in turn has created long-lasting harm. Countless members of the public are killed, wounded or end up a victim of criminal acts each year as a result of illegal gun sales that were negligently, recklessly and/or intentionally facilitated by Armslist. Armslist's acts and omissions as alleged herein have led to a substantial and unreasonable increase in the number people in the general public who are killed or injured by illegally obtained guns.

192.    Furthermore, as alleged herein, prior to facilitating the transaction at issue, Armslist was aware that its website was enabling the sale of weapons used in violent crimes such as those used in several well-publicized murders like the 40-caliber handgun used in the 2011 murder of Jitka Vesel, and the weapon used in the 2012 mass casualty in Brookfield, Wisconsin. Armslist was thus fully aware and on notice that it designed and operated its online gun marketplace in a way that encouraged prohibited sales that unreasonably interfered with the general public's safety, peace and comfort.

193.    In addition to the generalized harms suffered by the public from the acts and omissions of Armslist, Armslist caused Officer Stokinger to suffer discrete personal injuries of a direct and substantial character other than that which the general public shares, and caused Officer Stokinger damages, including significant past and future pain, suffering, disability, emotional distress, and loss of enjoyment of life, lost wages, and other compensable injuries and damages, all which exceed the harm Armslist's negligent acts and omissions cause the general public.

194.    The public nuisance caused by Armslist—the negligent, reckless and/or intentional facilitation of the sale of vast quantities of guns that ensured a steady flow of guns in large quantities to prohibited purchasers—is one that the Massachusetts legislature has tried to abate.

34

Through (i) requiring gun dealers to conduct background checks, (ii) mandating that private sellers verify that buyers have a valid gun license, and (iii) placing restrictions on which individuals may legally own and operate a gun, the Massachusetts legislature has established clear intent to limit the illegal use of guns—an intent that Armslist has consistently and knowingly undermined by facilitated countless transactions that were in direct violation of Massachusetts and federal laws.

## SIXTH CAUSE OF ACTION
### (Loss of Spousal Consortium Against All Defendants)

195. Plaintiffs repeat and reallege the allegations set forth above in this Complaint as if fully set forth herein.

196. Plaintiff Janella Stokinger is, and at all relevant times has been, the wife of Officer Stokinger.

197. As a direct and proximate result of the negligent, reckless, and/ or intentional acts of Defendants, Plaintiff Janella Stokinger has suffered a loss of spousal consortium, companionship, society, affection, services, support, advice, counsel, and physical intimacy.

198. As a direct and proximate cause of the negligent, reckless, and/ or intentional acts of Defendants, Plaintiff Janella Stokinger endured pain and suffering, lost wages, companionship, comfort, guidance, counsel and advice of her husband, Officer Stokinger.

199. As a direct and proximate cause of the negligent, reckless, and/ or intentional acts of Defendants, Plaintiff Janella Stokinger has had to assume many of the duties that normally would have been assumed by her husband, Officer Stokinger, including, but not limited to, child care duties and household duties, all to her damage in an amount to be determined at a trial of this matter.

35

## SEVENTH CAUSE OF ACTION
### (Loss of Support Against All Defendants)

200.     Plaintiffs repeats and reallege the allegations set forth above in this Complaint as if fully set forth herein.

201.     Plaintiff Janella Stokinger is, and at all relevant times has been, the wife of Officer Stokinger, and has been dependent on Officer Stokinger for his support and maintenance.

202.     Until January 8, 2016, Officer Stokinger had been an able-bodied and decorated nine-year veteran of the Boston Police Department, where he worked regularly and had reasonably and properly supported Janella Stokinger.

203.     As a direct and proximate cause of the negligent, reckless, and/ or intentional acts of Defendants, Janella Stokinger has been deprived of the regular and reasonable support and maintenance that she had previously received from her husband, Officer Stokinger.

204.     As a direct and proximate cause of the negligent, reckless, and/ or intentional acts of Defendants, Janella Stokinger will be permanently damaged and will in the future be deprived of the financial support and aid previously received from her husband, Officer Stokinger, because of his permanent injuries and inability to work, all to her damage in an amount to be determined at a trial of this matter.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment as follows:

(i)      For compensatory damages in amount to be determined at a trial of this matter;

(ii)     For any and all equitable relief that may be justified;

(iii)    Reasonable costs and attorneys' fees; and

(iv)    Granting such other and further relief as the Court deems just and proper.

36

153467.06501/110534977v.4

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October __, 2018

CROWE & MULVEY, LLP

By: _____
Elizabeth N. Mulvey

77 Franklin Street
Boston, MA 02110
(617) 426-4488

BRADY CENTER TO PREVENT
GUN VIOLENCE

Jonathan E. Lowy
*Pro Hac Vice Application Pending*

840 First Street NE
Suite 400
Washington, DC 20005
(202) 202-370-8100

BLANK ROME LLP

John D. Kimball
Martin S. Krezalek
Rachel Sims
Robyn L. Michaelson
*Pro Hac Vice Applications Pending*

The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 885-5000

*Attorneys for Plaintiff Kurt Stokinger*

37