# EXHIBIT B

04/27

NOTIFY 20

# COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**

**SUPERIOR COURT
CIVIL ACTION
NO. 1884CV03236-F**

## KURT STOKINGER & another[1]

### vs.

### ARMSLIST, LLC & others[2]

## MEMORANDUM OF DECISION AND ORDER
## ON ARMSLIST, LLC'S MOTION TO DISMISS

This action arises from the shooting of Boston Police Officer Kurt Stokinger ("Officer Stokinger") during a police investigation. Officer Stokinger and his wife, Janella Stokinger ("Mrs. Stokinger") (collectively, "the Stokingers"), assert various claims against the shooter, Grant Headley ("Headley"), the gun's seller, Sara Johnson ("Johnson"), and Armslist, LLC ("Armslist"), an online marketplace facilitating the purchase and sale of firearms. The Stokingers allege that Johnson used Armslist to purchase firearms – including the gun used to shoot Stokinger – and then illegally sold or transferred those firearms to individuals who were legally prohibited from possessing firearms. Before the court is Armslist's motion to dismiss the Stokingers' claims against it (Counts Three, Four, Five, Six, and Seven) on the ground that each claim is barred by the Communications Decency Act, 47 U.S.C. § 230 (2018). For the following reasons, Armslist's motion to dismiss is **ALLOWED**.[3]

---

[1] Janella Stokinger.
[2] Grant Headley and Sara Johnson.
[3] Armslist also filed a motion to dismiss for lack of personal jurisdiction but in light of the instant ruling, the court need not address the jurisdictional issue.

## **BACKGROUND**

Following is a summary of the well-pleaded factual allegations of the First Amended Complaint (the "complaint").[4]  See *Sisson v. Lhowe*, 460 Mass. 705, 707 (2011).

### A.  *Relevant Federal and State Regulation of Firearm Sales*

Federal law requires that only federally licensed firearms dealers may engage in the firearms business.  To obtain a federal firearms license, a person or entity must apply for – and be granted – a license from the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  Federally licensed firearms dealers are subject to duly promulgated regulations.  For example, licensed dealers are required to conduct background checks of potential buyers to ensure that guns are not sold to individuals who are prohibited from possessing firearms, such as felons, the mentally ill, domestic abusers, and minors (collectively, "prohibited purchasers").  In addition, licensed dealers must keep records of firearms sales to assist law enforcement with criminal investigations.  Licensed dealers also must inform law enforcement whenever a purchaser engages in a "multiple sale," which is when a purchaser buys more than one firearm within five business days as it may indicate firearms trafficking.  Licensed dealers also have a duty to screen for suspicious sales and may refuse a sale when the dealer believes that the sale is dangerous or risky.

Under federal law, unlicensed "private sellers" – persons not engaged in the firearms business – are permitted to sell a maximum of four firearms per year.  Such private sellers are not required to conduct background checks of potential buyers or keep a record of their transactions.

---

[4] As additional support for its motion, Armslist submitted a declaration from Jonathan Gibbon, the co-founder and President of Armslist, to which the Stokingers objected.  Insofar as the court has resolved the instant motion without the benefit of Mr. Gibbon's declaration, this objection is moot.

In Massachusetts, all firearm purchasers – licensed or not – must obtain a permit prior to buying a firearm, and the issuance of such a permit requires the individual to undergo a background check. G. L. c. 140, §§ 129B-129C.

### B.  Armslist.com

Armslist.com is a for-profit online firearms marketplace that facilitates sales of firearms and accessories. Armslist owns and operates Armslist.com, which it developed after several major websites chose to cease online firearm sales.

Armslist.com is not a federally licensed firearms dealer. Instead it functions as an intermediary by providing information to both firearms sellers and buyers so as to facilitate transactions. Prospective firearms customers use the website's internal e-mail system to contact firearms sellers to arrange a transaction. Customers may also contact sellers outside of the website by using the seller's contact information provided on the website.

### C.  The Firearm Involved in the Shooting

On January 8, 2016, Headley shot Stokinger in the leg with a .40 caliber Glock Model 27 semi-automatic handgun. Headley, a convicted felon, is a prohibited purchaser of firearms under Massachusetts law. G. L. c. 140, § 129B. After the shooting, fellow officers recovered Headley's firearm. The post-shooting investigation produced information giving rise to the Stokingers' allegation that Headley's possession of the firearm was traced to Armslist.com

3

transactions.[5]  The Stokingers believe that shortly after Johnson purchased the firearm from McNamara, either Johnson or Sullivan sold the gun to Headley.

   *D. Instant Action*

   On October 18, 2018, the Stokingers filed this action against Headley, Johnson, and Armslist.  Count One is a claim against Headley for assault and battery.  Counts Two and Three are negligence claims against Johnson and Armslist, respectively.  Count Four alleges that Armslist aided and abetted in Johnson's negligent sale of the firearm to Headley.  Count Five asserts a claim of public nuisance against Armslist.  Counts Six and Seven assert claims by Mrs. Stokinger against all defendants for loss of consortium and loss of support.  Armslist now moves to dismiss each of the claims against it (Counts Three, Four, Five, Six, and Seven) on the ground that the Stokingers' claims are barred by the Communications Decency Act ("CDA" or the "Act"), 47 U.S.C. § 230.

   The gravamen of the Stokingers' negligence claim (Count Three) is that Armslist.com's design and operational features facilitate illegal firearms sales and encourage illegal firearms trafficking because Armslist.com makes it easy for prospective buyers to locate private sellers by using a filter feature permitting prospective buyers to browse advertisements by private sellers. Insofar as most states do not require private firearm sellers to conduct background checks on

---

[5] In particular, ATF learned that Derek McNamara ("McNamara") purchased the firearm on March 3, 2015, from Black Op Arms, a federally licensed firearms dealer in Claremont, New Hampshire.  McNamara informed ATF that he then sold the firearm to Johnson, a New Hampshire woman who contacted him through Armslist.com.  McNamara met Johnson in a McDonald's parking lot in Warner, New Hampshire, in July 2015, and sold her the firearm.  Her confederate, Daniel Ray Sullivan ("Sullivan"), was a convicted felon.  On July 26, 2017, Johnson and Sullivan were indicted in on federal firearms charges in the United States District Court in New Hampshire; each pleaded guilty. Sullivan admitted he contacted Armslist.com to arrange various firearms purchases.

According to ATF's investigation, Johnson purchased and then sold an estimated thirty to sixty-three firearms that she procured from Armslist.com.  At least four of the firearms she purchased were recovered on the streets of Greater Boston within seven months of Johnson's purchase.

prospective customers, private sales are more attractive to prohibited purchasers.   Additionally, prospective customers may use the website's "location" filter to narrow their search to sales to specific states, enabling them to weed out sales in states with stricter gun laws.

The Stokingers further allege that Armslist is negligent because it permits users to maintain their anonymity, and takes no action to monitor or prevent illegal sales.  The Stokingers also claim that Armslist is aware that its website is a magnet for illegal gun transactions and negligently failed to institute reasonable safeguards to minimize the risks of such transactions, such as limiting the number of guns that can be sold or purchased by each user or requiring sellers to conduct background checks.[6]

Count Four alleges that in brokering the firearm transaction between Johnson and McNamara, Armslist aided and abetted in the negligent subsequent sale of the firearm to Headley.

Count Five alleges that Armslist created a public nuisance by designing and maintaining an online marketplace tailored to attract and encourage persons who wish to buy or sell firearms in contravention of federal and state gun laws.  As a result, the Stokingers claim that Armslist substantially and unreasonably interfered with the public's safety and comfort.

Counts Six and Seven allege that Armslist's aforementioned conduct was the proximate cause of Mrs. Stokinger's loss of consortium and loss of spousal support.

For the following reasons, the court concludes that Armslist is immune from each of these claims pursuant to the CDA.

---

[6] Because the court concludes that Armslist is immune from the negligence claim pursuant to the CDA, the court need not determine whether Armslist owed a duty of care to the Stokingers.

## DISCUSSION

### A.  CDA Generally

In enacting the CDA, Congress recognized that the internet was an extraordinary advancement in the availability of education and informational resources as well as a forum for free speech and cultural development.  47 U.S.C. § 230(a).  It also found that the internet had "flourished, to the benefit of all Americans, with a minimum of government regulation."  47 U.S.C. § 230(a)(4).  In light of its findings, Congress sought "to promote the continued development of the Internet" and "to preserve the vibrant and competitive free market that presently exists . . .".  47 U.S.C. § 230(b)(1)-(2).

To achieve its goals, the CDA provides broad immunity to web-based service providers for all claims arising from their publication of information from third parties.  *Doe v. MySpace Inc.*, 528 F.3d 413, 418 (5th Cir. 2008), citing 47 U.S.C. § 230(c)(1).  In fact, the CDA was enacted partially in response to cases in which internet publishers were held liable for defamatory statements posted by third parties on their message boards.  *Doe v. Backpage.com, LLC*, 817 F.3d 12, 18 (1st Cir. 2016), citing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 N.Y. Misc. LEXIS 229, *12-*14 (N.Y. Sup. Ct. May 24, 1995).  In reaction, Congress recognized the threat and "obvious chilling effect" that tort-based lawsuits could pose to the free exchange of information over the internet.  *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997). The CDA addresses the chill by immunizing interactive computer service providers from claims or theories of liability that "would treat [it] as the publisher or speaker of . . . information" provided by a third party.  See *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418

(1st Cir. 2007) (quotations omitted) (interactive computer service providers still liable for their

own conduct and their own speech).

   *B. The Instant Claims*

   The Stokingers' claims are predicated on Armslist's creation, design, and maintenance of

Armslist.com.  The CDA states, in pertinent part, "No provider or user of an interactive computer

service shall be treated as the publisher or speaker of any information provided by another

information content provider." 47 U.S.C. § 230(c)(1).  An interactive computer service is as

"any information service, system, or access software provider that provides or enables computer

access by multiple users to a computer server, including specifically a service or system that

provides access to the Internet and such systems operated or services offered by libraries or

educational institutions." 47 U.S.C. § 230(f)(2).  Here, the Stokingers do not dispute that

Armslist.com is an interactive computer service.  Rather, the central question before the court is

whether the Stokingers' claims treat Armslist as the publisher or speaker of the content provided

by the sellers and buyers of firearms who access its site.[7]  *Backpage.com, LLC*, 817 F.3d at 19.

The Stokingers argue that their claims do not treat Armslist as the publisher or speaker of third-

party content; instead, they claim that Armslist's liability is predicated on its role in developing,

designing, and maintaining a website that facilitates and encourages illegal gun trafficking.

   It appears that this issue is one of first impression in the Commonwealth, although the

highest state court in Wisconsin and the Court of Appeals for the First Circuit have already

addressed and resolved the same issue.  Review of the pleadings and case law in this area leads

---

[7] An information content provider is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

the court to agree that Armslist's conduct falls within the scope of the immunity set out in the CDA, consequently barring the Stokingers' claims.

C.  Analysis

There has been "near-universal agreement that section 230 should be not be construed grudgingly." *Backpage.com, LLC*, 817 F.3d at 18. "This preference for broad construction recognizes that websites displaying third-party content may have an infinite number of users generating an enormous amount of potentially harmful content, and holding website operators liable for that content 'would have an obvious chilling effect' in light of the difficulty of screening posts for potential issues." *Id.* at 18-19, quoting *Zeran*, 129 F.3d at 331. This broad construction has resulted in the recognition by courts across the country that many causes of action are premised on the publication or speaking of third-party content. See *National Ass'n of the Deaf v. Harvard Univ.*, 377 F. Supp. 3d 49, 65 (D. Mass. 2019).

For example, in *Backpage.com, LLC*, 817 F.3d at 20-21, the court concluded that "publishing" functions include not only "editorial decision[s] with respect to" the content of a particular posting, but also "the structure and operation of the website." In that case, three young sex trafficking victims filed suit against Backpage, alleging it engaged in a course of conduct that deliberately facilitated sex trafficking, *Id.* at 16. In so doing, Backpage removed postings by victim support organizations as well as law enforcement "sting advertisements" from the "Escorts" section of the website. *Id.* The plaintiffs also alleged that Backpage's rules governing advertising content were designed to encourage and facilitate sex trafficking, particularly where it did not require a content poster to provide identifying information and did not require phone or email verification. *Id.* at 16 & n.2. Although Backpage's filtering system prohibited

advertisements containing certain words or phrases associated with sex trafficking, a content poster could bypass that ban by using an abbreviated form of the word or phrase. *Id.* at 16. The plaintiffs also claimed that Backpage charged for advertisements posted in the "Adult Entertainment" section, thus profiting from sex trafficking. *Id.* at 17.

Plaintiffs argued that the CDA did not bar their claims because they did not seek to hold Backpage liable as a "publisher or speaker" of third-party content; rather, they sought to hold Backpage liable for designing a website that made it a participant in sex trafficking. *Id.* at 20. The court disagreed, concluding that the complained-of conduct was "part and parcel of the overall design and operation of the website," and consequently, such features were editorial choices falling "within the purview of traditional publisher functions." *Id.* at 21. The court also noted that other jurisdictions had rejected similar claims attempting to hold website operators liable for failing to provide sufficient protections to users from harmful content created by others. See *id.* at 21, citing *MySpace Inc.*, 528 F.3d at 419-420 (failing to implement basic safety measures was another way of claiming website operator was liable for publishing third-party content).

In response to *Backpage.com, LLC*, Congress enacted Public Law 115-164, titled "Allow States and Victims to Fight Online Sex Trafficking Act of 2017" (the "2018 Amendment") to clarify that the CDA "was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution . . . ". *Id.* The 2018 Amendment did not narrow the broad scope of the CDA's immunity – except in relation to sex trafficking. The court's holding in

*Backpage.com, LLC* was superseded by the enactment of the 2018 Amendment, but the broad

legal principles immunizing other website operators, like Armslist, remain in effect.[8]

Here the Stokingers' challenges to Armslist.com, see *supra*, are the same as or similar to

those raised in *Backpage.com, LLC.*  As was the case in *Backpage.com, LLC*, the challenges

relate to the design and structure of the website, which are editorial decisions, so the Stokingers'

claims are precluded under the CDA.  See *Backpage.com, LLC*, 817 F.3d at 21 ("Features such as

these, which reflect choices about what content can appear on the website and in what form, are

editorial choices . . .").  See also *Green v. America Online (AOL)*, 318 F.3d 465, 471 (3rd Cir.

2003), cert. denied, 540 U.S. 877 (2003) ("decisions relating to the monitoring, screening, and

deletion of content from its network [are] actions quintessentially related to a publisher's role"

and protected by CDA).

The Stokingers claim that Armslist could have done more to discourage or delete the

offending or unlawful content or changed its policies so as to reduce the harmful content posted

on its website is merely another way of stating that Armslist is liable for publishing the third-

party content.  See *MySpace, Inc.*, 528 F.3d at 420-421, cert. denied, 555 U.S. 1031 (2008)

(where sexual assault victim alleged website operator failed to implement measures that would

have prevented her from communicating with predator, court dismissed victim's claims because

her allegations were another way of claiming website was liable for publishing the

---

[8] The Stokingers refer to various Congressional floor statements, claiming that the CDA should be read in light of its purpose, which is to promote decency and to prevent results like *Stratton Oakmont, Inc.*, 1995 N.Y. Misc. LEXIS at *14, which held a website operator liable for publishing defamatory third-party posts.  Is not the role of this court to rewrite legislation to comport with a perceived or presumed purpose motivating its enactment.  The quite legitimate question of whether websites like Armslist.com should operate in the fashion they do must be addressed by Congress.  If Congress did not intend to immunize firearms markets like Armslist, then it need only amend § 230 to reflect that intent as it did in response to the court's decision in *Backpage.com, LLC.*

communications of another). See also *Universal Commc'n Sys., Inc.*, 478 F.3d at 422 (website operator's decision not to reduce misinformation by changing its website policies was "as much an editorial decision with respect to that misinformation as a decision not to delete a particular posting"); *Green*, 318 F.3d at 470 (failure properly to police its network for content transmitted by users treats website as "publisher or speaker" of that content).

The Stokingers allege that Armslist either knew or should have known that its website facilitates and encourages illegal gun trafficking. It is well-established that "notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech". *Universal Commc'n Sys., Inc.*, 478 F.3d at 420. Immunity applies "even after notice of the potentially unlawful nature of the third-party content." *Id.*

The Stokingers suggest their claims are directed not to content-posters, but to Armslist's conduct and to the content that Armslist itself created.[9] While the Stokingers are correct that an interactive computer service provider remains liable for its own conduct and its own speech, see *Universal Commc'n Sys., Inc.*, 478 F.3d at 419, the Stokingers' claim that Armslist created the content at issue here was reviewed and rejected in a similar case. See *Daniel v. Armslist, LLC*, 926 N.W.2d 710 (Wis. 2019), cert. denied, 140 S. Ct. 562 (2019).

*Daniel* involved a mass shooting in Wisconsin, where the shooter purchased the firearm from a private seller on Armslist.com. *Id.* at 714. Daniel, a child of one of the victims, subsequently filed suit against Armslist asserting the same claims alleged in this case –

---

[9] The Stokingers also argue that the presumption against the preemption of state common law claims applies in this case. See *Ajemian v. Yahoo! Inc.*, 478 Mass. 169, 178 (2017) ("In interpreting a Federal statute, we presume that Congress did not intend to intrude upon traditional areas of State regulation or State common law unless it demonstrates a clear intent to do so."). However, this argument fails because the CDA expressly preempts all state claims that are "inconsistent with this section." See 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

negligence, aiding and abetting tortious conduct, and public nuisance – among others.  *Id.* at 716.

Armslist moved to dismiss the complaint, arguing there, as here, that the CDA barred Daniel's

claims.  Daniel claimed there, as do the Stokingers here, that through the design and operation of

its website, Armslist helped "develop" the content of the advertisement that led to the firearm

sale; therefore, it was an "information content provider" within the meaning of § 230(f)(3).  See

*id.* at 718.  Daniel also argued that her claims were not based on Armslist's publication of third-

party content, but instead were based on Armslist's facilitation and encouragement of illegal

firearm sales by third parties.  *Id.*  The Stokingers advance those same arguments in this case.

Initially, Wisconsin's Court of Appeals agreed with Daniel, declaring that the CDA did

not bar Daniel's claims.  See *Daniel v. Armslist, LLC,* 913 N.W.2d 211, 217-224 (Wis. 2018).

The Supreme Court of Wisconsin disagreed, reversing, and holding that Armslist did not develop

the content at issue (i.e., the firearm advertisement that led to the sale), and because Daniel's

claims treated Armslist as the publisher of that content, her claims were barred.  *Daniel v.*

*Armslist, LLC,* 926 N.W.2d at 722, 726-727.

In reaching its conclusion, the court employed the "material contribution" test to

determine whether Armslist materially contributed to the illegality of the third-party content or

whether it merely published content created by someone else.[10]  *Id.* at 720, citing *Fair Hous.*

*Council v. Roomates.com,* 521 F.3d 1157, 1168 (9th Cir. 2008).  Whether a website's design

features employ "neutral tools" is helpful in determining whether those features materially

contribute to the unlawfulness of the content.  *Id.* at 721.  A "neutral tool" is a feature provided

---

[10] "[M]aterial contribution 'does not mean merely taking action that is necessary to the display of allegedly illegal content,' such as providing a forum for third-party posts. 'Rather, it means being responsible for what makes the displayed content allegedly unlawful.'"  *Daniel,* 926 N.W.2d at 719, quoting *Jones v. Dirty World Entm't Recordings LLC,* 755 F.3d 398, 410 (6th Cir. 2014).

12

by an interactive computer service provider that can be "utilized for proper or improper

purposes" (citations omitted). *Id.* "A defendant who provides a neutral tool that is subsequently

used by a third party to create unlawful content will generally not be considered to have

contributed to the content's unlawfulness," even if the interactive computer service provider

knew, or should have known, that its neutral tools were being used for illegal purposes. *Id.* at

721, 722.

      Although Daniel claimed that Armslist's design features made it easier for prohibited

purchasers to illegally obtain firearms, the court held that the complained-of design features were

"neutral tools," and therefore, Armslist did not materially contribute to the development of the

firearm advertisement. *Id.* at 722. The court also concluded that the other design features that

Daniel claimed could have been implemented were merely "precautions" that were permissible

but not required under the CDA.[11] *Id.* Additionally, the court was not persuaded by Daniel's

argument that Armslist.com made illegal firearm sales easier, stating that such an argument

merely attempted to distinguish the case "from the litany of cases dismissing suits against

website operators who failed to screen for unlawful content." *Id.* at 723. The court also noted

that Armslist's intent did not affect its immunity because the CDA does not contain a good faith

requirement. *Id.* For those reasons, the court held that Armslist was not a content provider

within the meaning of § 230(f)(3); rather, the content at issue was provided by a third party. *Id.*[12]

---

[11] Congress did not want to discourage interactive computer service providers from voluntarily screening unlawful
third-party content. Therefore, under § 230(c)(2), an interactive computer service provider is not liable for "any
action voluntarily taken in good faith to restrict access to or availability of material that the provider or user
considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable . . . ".

[12] The court also concluded that with respect to Daniel's claims (negligence, aiding and abetting, and public
nuisance), that the duty Armslist allegedly violated derived from its immunized role as a publisher of third-party
content. *Daniel*, 926 N.W.2d at 725-726.

Here, the Stokingers' claims concern both the same design features and the same arguments raised in *Daniel*. The court concludes that Armslist is not an information content provider, and that the Stokingers' claims are based on complaints about posted content created or developed by a third-party. Armslist is thus entitled to immunity under the CDA, and the Stokingers' claims must be dismissed.

## ORDER

For the foregoing reasons, it is hereby **ORDERED** that the defendant Armslist, LLC's motion to dismiss is **ALLOWED**.

Dated at Lowell, Massachusetts, this 13th day of March, 2020.

Heidi E. Brieger
Justice of the Superior Court

attest: Andy pcalas
Asst Clerk

14