# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

**Kurt Stokinger et al.**

     v.

**Armslist, LLC**

Case No. 23-cv-428-PB-TSM
Opinion No. 2024 DNH 056

## MEMORANDUM AND ORDER

Kurt Stokinger, a former Boston police officer, was shot in the line of duty by a felon in possession of a handgun that was at one point sold via Armslist.com, a website that hosts firearms classifieds. Stokinger and his spouse sued Armslist for negligence and other torts, alleging that Armslist's failure to institute certain safeguards on its website enabled the shooter to unlawfully obtain the handgun. Armslist has moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(2), arguing that this court lacks personal jurisdiction to hear the claims. I agree and therefore grant the motion to dismiss.[1]

---

[1] Armslist filed a concurrent motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Doc. 20. That motion is denied as moot in light of my conclusion that I lack jurisdiction to hear the plaintiffs' claims.

# I.    BACKGROUND

**A.    Facts**

1.    Armslist's Website and Business Model

Armslist is a limited liability company organized and headquartered in Pennsylvania. Doc. 21-2 at 2. Armslist owns and operates Armslist.com, which is a "craigslist-style, for-profit, online firearms marketplace that enables users to sell firearms and firearm-related accessories to private individuals through website postings." Doc. 21-9 at 4.

The website enables users to create listings offering to either buy or sell various products. Doc. 21-2 at 5. When creating a listing, users are prompted to input certain information, including their location, email address, and a description of the item for sale. Id. at 4-5. To locate listings of interest, users can input a keyword into a search bar and then filter the results by various criteria, including location. Id. at 3. This filtering function allows users to limit their results to items listed for sale in a particular state, including New Hampshire. Id. Users can then respond to listings by either utilizing an email link embedded in the listing or contacting the seller directly using information provided in the listing. Id. at 5-6. All transactions occur offline, without any further involvement from Armslist. Id.

Generally speaking, Armslist's users fall into one of two categories. "Private parties" are individual users who wish to make an occasional sale or

purchase. Id. at 4. Private parties are not required to register an account with Armslist and can make a limited number of postings, free of charge. Id. at 4, 6. "Premium vendors," in contrast, are typically federally-licensed firearms dealers seeking to engage in more regular sales. Id. at 3. Premium vendors must register an account and are subject to Armslist's approval. Id. To obtain approval, a vendor must provide evidence of its federal firearms license or else commit to selling only non-firearm products, such as gun holsters or other accessories. Id. Premium vendors pay recurring membership fees and, in exchange, are permitted to create an unlimited number of listings. Id.

Armslist derives revenue from the membership fees of its premium vendors and fees charged to third-party advertisers who purchase advertising space on the website. Id. at 6. Armslist does not obtain any revenue directly from private parties or their listings. Id.

2.    Underlying Facts

In 2015, Derek McNamara posted a Glock Model 27 handgun for private sale on Armslist. Doc. 34-1 at 12. Sara Johnson, a resident of New Hampshire, responded to McNamara's listing with an offer to purchase the handgun. Id. McNamara agreed and, after confirming that Johnson had the required permits, he transferred the firearm to her in Warner, New Hampshire. Id. at 12-13.

Unbeknownst to McNamara, Johnson was a gun trafficker who had used Armslist to purchase dozens of firearms, often acting as a straw purchaser for her then-boyfriend, Daniel Sullivan. Id. at 5; Doc. 1 at 29. Plaintiffs allege that Johnson later sold McNamara's firearm to Grant Headley, a prohibited person with several felony convictions, either directly or indirectly through Sullivan. Doc. 1 at 29-30.

On January 8, 2016, Headley used the handgun that he allegedly obtained from Johnson to shoot Stokinger multiple times in the leg while Stokinger was working as a police officer in Boston, Massachusetts. Id. at 3-4. Stokinger suffered permanent injuries as a result, prematurely ending his career as a police officer. Id. at 42-43.

**B.    Procedural History**

In October 2018, Stokinger and his wife brought suit against Armslist in Massachusetts state court for negligence and other torts. Doc. 21-5 at 28-38. Armslist responded with two separate motions to dismiss. The first asserted that the court lacked personal jurisdiction and the second argued that the plaintiffs' claims failed on the merits because they were preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230. Doc. 21-10 at 5.

The Massachusetts Superior Court granted Armslist's second motion to dismiss on the merits, but declined to address Armslist's personal jurisdiction

argument. Doc. 21-6 at 2 n.3. Armslist filed a motion for partial

reconsideration, asking the court to address its personal jurisdiction motion

in order to preclude a potential remand on that basis should the plaintiffs

appeal. Doc. 21-9 at 3. The court issued a brief order concluding that it lacked

personal jurisdiction based on the present record but that the plaintiffs were

granted leave to obtain jurisdictional discovery. Id.

Although most of the plaintiffs' discovery was aimed at Armslist's

contacts with Massachusetts, several requests also sought information

related to Armslist's contacts with New Hampshire. For example, the

plaintiffs requested documents pertaining to Armslist's communications with

New Hampshire-based users and third-party advertisers, as well as

Armslist's marketing efforts in the state. Doc. 21-7 at 5-14. After initially

objecting to the requests, Armslist agreed to provide the plaintiffs with

limited discovery on its contacts with New Hampshire. Doc. 21-8 at 3-4.

Armslist responded to the plaintiffs' document requests, but only as to its

contacts with New Hampshire in 2015 and 2016, which Armslist viewed as

the relevant time period for determining personal jurisdiction. Id.

Armslist represented that it had 8 New Hampshire-based premium

vendors in 2015 and 11 in 2016, which resulted in $1,670 in revenue in 2015

and $2,910 in 2016. Doc. 21-2 at 7. Armslist provided the plaintiffs with all

documents regarding its communication with and solicitation of New

Hampshire-based premium vendors during this time frame, which consisted of a single email from a New Hampshire firearms dealer providing Armslist with a copy of the dealer's federal firearm license. Doc. 21-8 at 3, 6-7. Armslist denied having any documents pertaining to its advertising in New Hampshire or other efforts to increase sales in the state in 2015 or 2016. Id. at 3. It also denied having any documents pertaining to its communications with New Hampshire-based private parties or third-party advertisers in 2015 or 2016. Id. Following the close of jurisdictional discovery, the Massachusetts Superior Court concluded that it lacked personal jurisdiction over Armslist and again dismissed the plaintiffs' claims. Doc. 21-9 at 10.

Approximately two years later, in September 2023, the plaintiffs filed a complaint against Armslist in this court. Doc. 1 at 1. The complaint is substantially similar to the complaint filed in Massachusetts and advances the same theories of liability: negligence, aiding and abetting tortious conduct, public nuisance, loss of spousal consortium, and loss of support. Id. at 31-43. The crux of the plaintiffs' claims is that Armslist "negligently and recklessly designed [its website] in such a way that it actively encourages, assists, and profits from the illegal sale and purchase of firearms." Id. at 2. These defects, the plaintiffs allege, proximately caused Stokinger's injuries because they enabled Headley to unlawfully obtain the handgun used in the shooting. Id.

6

## II.   <u>ANALYSIS</u>

Under the Due Process Clause of the Fourteenth Amendment, a court may only exercise jurisdiction over individuals who "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[2] <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945) (quoting <u>Milliken v. Meyer</u>, 311 U.S. 457, 463 (1940)). Armslist moves to dismiss the plaintiffs' complaint under Rule 12(b)(2) for lack of personal jurisdiction, asserting that the plaintiffs cannot establish that it had the constitutionally-required minimum contacts with New Hampshire. The plaintiffs argue that jurisdiction can be found based on the current record but ask the court, in the alternative, to defer a ruling on the motion and allow jurisdictional discovery if personal jurisdiction cannot be established on the current record. I begin by first considering whether the plaintiffs have established jurisdiction on the current record before turning to their alternative request for jurisdictional discovery.

---

[2]     Where, as here, a case is brought pursuant to the court's diversity jurisdiction, the plaintiff must demonstrate that the "defendant's contacts with the state satisfy both the state's long-arm statute as well as the Due Process Clause of the Fourteenth Amendment." <u>Vapotherm, Inc. v. Santiago, 38 F.4th 252, 258 (1st Cir. 2022)</u>. Because New Hampshire's long-arm statute is "coextensive with the outer limits of due process," my analysis focuses exclusively on the constitutional inquiry. <u>Sawtelle v. Farrell, 70 F.3d 1381, 1388 (1st Cir. 1995)</u>.

## A.    Personal Jurisdiction

When faced with a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant. Rosenthal v. Bloomingdales.com, LLC, 101 F.4th 90, 94 (1st Cir. 2024). "[A] district court may choose from among several methods for determining whether the plaintiff has met [this] burden." Kuan Chen v. U.S. Sports Acad., Inc., 956 F.3d 45, 51 (1st Cir. 2020) (quoting Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016)). Where, as here, the motion to dismiss is filed "at the inception of the case and the issue of jurisdiction is not intertwined with the merits, the prima facie approach controls." Motus, LLC v. CarData Consultants, Inc., 23 F.4th 115, 121 (1st Cir. 2022).

Under this approach, the plaintiff must "proffer evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction." Baskin-Robbins, 825 F.3d at 34. The plaintiff's evidence must be taken as true and construed in the light most favorable to the plaintiff's jurisdictional claim. Nandjou v. Marriott Int'l, Inc., 985 F.3d 135, 147 (1st. Cir. 2021). In addition to evidence proffered by the plaintiff, I may also consider facts proffered by the defendant, but only to the extent that they are uncontradicted. A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016).

The plaintiffs claim only specific jurisdiction, which exists where the "case relates sufficiently to, or arises from, a significant subset of contacts between the defendant and the forum." Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 288 (1st Cir. 1999). To establish the existence of specific jurisdiction, the plaintiffs must demonstrate that:

> (1) their claim directly arises out of or relates to the defendant's forum-state activities; (2) the defendant's contacts with the forum state represent a purposeful availment of the privilege of conducting activities in that state, thus invoking the benefits and protections of that state's laws and rendering the defendant's involuntary presence in that state's courts foreseeable; and (3) the exercise of jurisdiction is ultimately reasonable.

Scottsdale Cap. Advisors Corp. v. The Deal, LLC, 887 F.3d 17, 20 (1st Cir. 2018). "Failure to make any one of these showings dooms any effort to establish specific personal jurisdiction." Id. Because I find that the plaintiffs have failed to establish purposeful availment, I conclude that personal jurisdiction cannot be based on the current record without addressing the remainder of the tripartite test. See Motus, 23 F.4th at 124.

The purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (cleaned up). To this end, the "purposeful availment inquiry focuses on the defendant's intentionality and rests on two cornerstones: voluntariness and

foreseeability." Rosenthal, 101 F.4th at 96 (cleaned up). Voluntariness requires that the defendant's contacts with the forum proximately result from the defendant's own actions, rather than those of the plaintiff or other third parties. Id. Foreseeability, in turn, requires that the defendant's contacts with the forum "are such that [the defendant] should reasonably anticipate being haled into court there." Burger King, 471 U.S. at 474 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

Although the purposeful availment inquiry "often proves dispositive" in "website cases," Motus, 23 F.4th at 124, the Supreme Court has yet to "definitively answer[] how a defendant's online activities translate into contacts" for the purposes of personal jurisdiction, Plixer Int'l, Inc. v. Scrutinizer GmbH, 905 F.3d 1, 7 (1st Cir. 2018). Despite the limited guidance on the matter, "[o]ne baseline principle has emerged: a website operator does not necessarily purposefully avail itself of the benefits and protections of every state in which its website is accessible." Plixer, 905 F.3d at 8 (collecting cases). Rather, to justify the exercise of jurisdiction over an out-of-state website operator, "there must be more," such as "evidence of specific targeting of forum residents" or "evidence that the website has generated 'substantial revenue from forum residents.'" Motus, 23 F.4th at 125 (quoting Chen, 956 F.3d at 60).

The plaintiffs principally rely on two facts to demonstrate purposeful availment: first, that Armslist created a filtering feature for users to isolate New Hampshire-based listings, and second, that Armslist derived revenue from a handful of New Hampshire-based premium vendors. These facts, however, do not reveal the sort of substantial and voluntary connection to New Hampshire that due process demands.

In the plaintiffs' view, Armslist specifically targeted New Hampshire residents by instituting a filtering function that enabled users to isolate listings in New Hampshire. While it is true that a website's references to the forum state may sometimes demonstrate intentional targeting, see, e.g., Sarah's Hat Boxes, LLC v. Patch Me Up, LLC, 2013 DNH 058, 2013 WL 1563557, at *6-7 (D.N.H. Apr. 12, 2013), the plaintiffs read too much into Armslist's inclusion of New Hampshire in its 50-state filtering feature. The decision to include New Hampshire alongside the other 49 states indicates that Armslist is amenable to serving the New Hampshire market, but it does not indicate that Armslist specifically targeted New Hampshire. Afterall, "[t]o target every user everywhere . . . is to target no place at all." Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 321-322 (5th Cir. 2021). Stated differently, because the filtering feature is necessarily designed to benefit users regardless of their location, it does not render the website "more likely to solicit or serve customers in [New Hampshire] than anywhere else" and

therefore does not specifically target New Hampshire. Motus, 23 F.4th at 123; cf. Sarah's Hat Boxes, 2013 WL 1563557, at *2, 6 (finding that a "defendant designed [its] website to reach into New Hampshire" by including a circumscribed list of specific states and towns where it shipped its products, including New Hampshire and several of its towns).

The courts of appeals have similarly refused to find specific targeting based solely on the forum state's inclusion in a website feature that merely references all 50 states. For example, in Fidrych v. Marriott International, Inc., the Fourth Circuit concluded that a hotel website did not target South Carolina residents by "includ[ing] South Carolina as an option in the drop-down menu used by customers to select their state of residence when making reservations." 952 F.3d 124, 142-143 (4th Cir. 2020). Noting that the drop-down menu also listed "every other state in the country," the court reasoned that the feature indicated the hotel's willingness "to accept reservations from South Carolina residents" but did not demonstrate that the hotel was specifically "targeting South Carolina residents through its website." Id. "To the contrary," the court explained, "the list of options confirms that the website was accessible to all but targeted at no one in particular." Id. at 143.

Similarly, in NexLearn, LLC v. Allen Interactions, Inc., the Federal Circuit rejected the plaintiff's argument that the defendant's website "specifically targeted Kansas residents" by allowing customers to "select

'Kansas' from a dropdown menu in the billing-address section" when placing an order on the website. 859 F.3d 1371, 1377 (Fed. Cir. 2017). Like the Fourth Circuit, the Federal Circuit reasoned that the feature merely indicated the website's "amenability to selling [its products] to Kansas residents," but did not demonstrate that the defendant purposefully availed itself of Kansas law. Id. at 1378.

The reasoning exemplified by these opinions comports with the purpose behind due process limitations on specific jurisdiction, which is "to ensure that States with 'little legitimate interest' in a suit do not encroach on States more affected by the controversy." Ford Motor Co. v. Montana, 592 U.S. 351, 360 (2021) (quoting Bristol-Myers Squibb Co. v. California, 582 U.S. 255, 262 (2017)). Including New Hampshire in the 50-state filtering feature simply renders the website as useful in New Hampshire as it is in every other state and therefore amounts to little more than making the website available in New Hampshire. If this, standing alone, were enough to justify the exercise of jurisdiction, "the universality of websites in the modern world would overwhelm constitutional limitations on the exercise of personal jurisdiction." Chen, 956 F.3d at 60.

Accordingly, the filtering feature alone is not enough to demonstrate specific targeting. Yet the plaintiffs have not proffered any other evidence to demonstrate that Armslist sought to attract New Hampshire residents to its

website. Cf. Gather, Inc. v. Gatheroo, LLC, 443 F. Supp. 2d 108, 116 (D. Mass. 2006) (finding purposeful availment where a website not only permitted filtering by state, but also "accept[ed] members from [the forum state]," "solicit[ed] their continued business," and "communicat[ed] directly with [forum state] users"). For example, there is no evidence that Armslist advertised in New Hampshire or otherwise solicited New Hampshire residents to use its website. Cf. Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 717 (1st Cir. 1996) (finding purposeful availment where the defendant "advertised its hotel in national and international publications that circulated in Massachusetts;" "solicited by direct mail some of its previous guests residing in Massachusetts;" and "listed its hotel in various hotel guides used at travel agencies in Massachusetts"). Nor is there evidence that Armslist affirmatively accepted or encouraged posts from New Hampshire users; to the contrary, it is undisputed that Armslist does not review listings in the regular course of business. Cf. Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1126 (W.D. Pa. 1997) (finding purposeful availment where a website "repeatedly and consciously chose to process [forum state] residents' applications [for an account] and to assign them passwords"). And, with the exception of a single email from a New Hampshire-based firearms dealer that apparently went unanswered, there is no evidence that Armslist has ever communicated with any New Hampshire residents. Cf. Gather, 443

F. Supp. 2d at 116 (finding purposeful availment based in part on the defendant's direct communications with users in the forum state). Given the absence of evidence that Armslist intentionally and specifically sought to serve the New Hampshire market, the fact that New Hampshire was one of 50 states included in the website's filtering function is of little value.

The plaintiffs' reliance on Armslist's receipt of revenue from New Hampshire-based premium vendors fares no better. That a handful of New Hampshire-based firearms dealers paid for a premium membership does not indicate that Armslist sought to serve the New Hampshire market given the lack of evidence that Armslist did anything to recruit or solicit premium vendors in the state. See Chen, 956 F.3d at 61 (finding no purposeful availment where the defendant's contacts with the state "stem[ed] from [a third party's] unilateral activity"). Indeed, the only evidence in the record is that Armslist "did not actively recruit Premium Vendors in New Hampshire" or "attend[] any trade shows or gun shows in New Hampshire" between 2015 and 2016. Doc. 21-2 at 7. See Chen, 956 at 56 (noting that facts proffered by the defendant may be treated as undisputed, even if challenged by the plaintiff, where the plaintiff fails to offer evidence to the contrary).

Furthermore, that Armslist received some amount of profit from these premium vendors does not establish that it engaged in the sort of "regular flow or regular course of sale in the forum [that] could make the exercise of

jurisdiction foreseeable[.]" Knox v. MetalForming, Inc., 914 F.3d 685, 691-692 (1st Cir. 2019) (cleaned up). Armslist received less than $3,000 per year in revenue from its New Hampshire premium vendors in 2015 and 2016, constituting no more than 0.4% of the company's total revenue. Doc. 21-2 at 7. Such negligible sales stand in stark contrast to the kind of business dealings that courts have generally found sufficient to confer personal jurisdiction. Cf. Plixer, 905 F.3d at 10 (collecting cases and finding purposeful availment where the defendant obtained "nearly $200,000 in business [from forum residents] over three-and-a-half years"); Knox, 914 F.3d at 692 (finding purposeful availment where the defendant engaged in hundreds of transactions with forum state residents which "led to nearly $1.5 million of Massachusetts sales"); see also Oticon, Inc. v. Sebotek Hearing Sys., LLC, 865 F. Supp. 2d 501, 514-515 (D.N.J. 2011) (relied on in Plixer, 905 F.3d at 11) (finding that a defendant's "scant sales activity" could not "justify the exercise of specific jurisdiction" where the defendant made less than ten sales in the forum, "total[ing] less than $3,383.00 in revenue").

Moreover, Armslist's relationship with the New Hampshire premium vendors does not appear to have been particularly meaningful. See PREP Tours, Inc. v. Am. Youth Soccer Org., 913 F.3d 11, 23 (1st Cir. 2019) (noting that an "ongoing and close-working relationship" with a forum resident "could establish the requisite substantial connection between the defendants

16

and the forum"). Nothing in the record indicates that Armslist engaged in regular communications with or otherwise attempted to foster an ongoing relationship with the New Hampshire vendors. To the contrary, it appears as though Armslist's interaction with the premium vendors was limited to verifying that they met the requirements for a premium account and accepting their membership payments. Cf. id. at 25-26 (finding no purposeful availment, despite evidence that the defendant communicated with the in-forum plaintiff on multiple occasions regarding the plaintiff's provision of services within the forum). All told, neither the filtering function nor Armslist's dealings with the New Hampshire premium vendors, either alone or in combination, demonstrates that Armslist had a "substantial connection with the forum State" sufficient to authorize the exercise of jurisdiction.[3]

---

[3]    Although the plaintiffs primarily argue that purposeful availment can be found based on Armslist's intentional targeting of the forum, they argue in the alternative that purposeful availment could "be found under a stream-of-commerce theory." Doc. 28-1 at 18. In order to succeed on such a theory, the plaintiffs would need to demonstrate the existence of certain "'plus' factors evincing a corporate defendant's deliberate attempt to serve the forum state, that is, factors indicating something over and above the defendant's mere awareness that its products were entering a given market in the stream of commerce." Rosenthal, 101 F.4th at 96 (quoting Motus, 23 F.4th at 124-125). The plaintiffs' alternative "stream-of-commerce" theory is premised on the same evidence as their primary intentional targeting theory; that is, "Armslist's state-specific search function and New Hampshire premium vendors[.]" Doc. 28-1 at 18. For the reasons I explained, this evidence is insufficient to demonstrate that Armslist intended to serve the New Hampshire market, regardless of how it is couched. See Rosenthal, 101 F.4th at 96.

Burger King, 471 U.S. at 475 (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)).

The only other evidence proffered by the plaintiffs in support of purposeful availment pertains to the number of New Hampshire-based listings posted to Armslist in recent years. For example, the plaintiffs point to data that, from 2018 and 2020, Armslist hosted an average of 16,277 listings per year from New Hampshire-based private parties. Doc. 28-5 at 2-3. The plaintiffs also supplied evidence that, as of January 2024, there were 1,607 active listings for items located in New Hampshire. Doc. 28-4 at 2.

Although the plaintiffs make passing reference to this evidence throughout their brief, they fail to articulate a developed argument as to how it supports their showing of jurisdiction. Regardless, the evidence does not indicate that Armslist purposefully and voluntarily availed itself of the privilege of conducting activities in New Hampshire.[4]

---

[4]     I note that there is a substantial question as to whether evidence postdating when the cause of action arose is even relevant to specific jurisdiction. Armslist relies on Harlow v. Children's Hospital for the proposition that "in most cases, contacts coming into existence after the cause of action arose will not be relevant" to the specific jurisdiction inquiry. 432 F.3d 50, 62 (1st Cir. 2005). Plaintiffs counter that Harlow is inapplicable because their public nuisance claim raises a continuing tort, which the court in Plixer found falls outside Harlow's "general rule." 905 F.3d at 11. I need not stake out a position on this legal issue because the evidence the plaintiffs rely on is not sufficient to establish purposeful availment in any event.

As I explained, the purposeful availment inquiry turns on the defendant's own actions, and not those of third parties. Thus, "any contacts that cannot be attributed 'proximately' to the defendant's own activities constitute 'unilateral' activity that cannot establish purposeful availment." PREP Tours, Inc., 913 F.3d at 20 (quoting Burger King, 471 U.S. at 475). Without any evidence that Armslist solicited New Hampshire citizens to use its website or otherwise involved itself in their posts, the New Hampshire-based listings can only be regarded as the unilateral activity of third parties who happen to reside in New Hampshire. Cf. be2 LLC v. Ivanov, 642 F.3d 555, 559 (7th Cir. 2011) (finding no purposeful availment based on evidence that multiple forum residents created profiles on the defendant's website and noting that, absent evidence of specific targeting, the website users may have created profiles "unilaterally by stumbling across the website").

Furthermore, because private parties can create listings for free, the sheer number of New Hampshire-based listings does not demonstrate that Armslist knowingly derived "substantial revenue from forum residents." Chen, 956 F.3d at 60. While it could be inferred that Armslist obtained at least some amount of third-party advertising revenue from the New Hampshire listings, the record lacks any basis on which to conclude that this revenue was at all significant. There is no evidence as to how much of Armslist's advertising revenue can be linked to the New Hampshire listings

and, absent evidence that the New Hampshire listings accounted for a significant portion of the overall activity on the website, I cannot infer that any such revenue would constitute a sufficiently substantial portion of Armslist's business. Cf. Rancourt v. Meredith Corp., No. 22-cv-10696-ADB, 2024 WL 381344, at *8 (D. Mass. Feb. 1, 2024) (finding purposeful availment where the plaintiffs produced evidence that forum-based users of a free mobile application accounted for "over $66,000 or 2% of the App's total U.S. ad revenue").

At bottom, the plaintiffs have failed to proffer evidence that Armslist voluntarily developed the sort of substantial connection with New Hampshire that would render the exercise of jurisdiction foreseeable. Accordingly, the plaintiffs have not met their burden of establishing specific jurisdiction.

## B.   Jurisdictional Discovery

In light of this conclusion, the question then becomes whether the plaintiffs should be granted leave to pursue additional jurisdictional discovery. The plaintiffs acknowledge that they received some amount of discovery regarding Armslist's contacts with New Hampshire in 2015 and 2016 through the Massachusetts action but request additional discovery as to Armslist's contacts with New Hampshire between 2016, when the shooting

20

occurred, and 2023, when the complaint was filed.[5]

A plaintiff seeking jurisdictional discovery "must make a colorable claim of jurisdiction and must show that it has been diligent in preserving its rights" to such discovery. Motus, 23 F.4th at 128 (cleaned up). To satisfy this burden, the plaintiff must "present facts to the court which show why jurisdiction would be found if discovery were permitted." Negro-Torres v. Verizon Comm'ns, Inc., 478 F.3d 19, 27 (1st Cir. 2007). "Mere conjecture or speculation is not enough." Williams v. Romarm, SA, 756 F.3d 777, 786 (D.C. Cir. 2014) (cleaned up).

Although "[a] timely and properly supported request for jurisdictional discovery merits solicitous attention," district courts enjoy "broad discretion to determine whether jurisdictional discovery is warranted," Motus, 23 F.4th at 128 (cleaned up). Thus, "even when the plaintiff has been diligent and has made a colorable claim for personal jurisdiction," the court retains discretion to conclude that discovery is not warranted. United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 525 (1st Cir. 2001).

---

[5]    As I explained, see supra note 4, there is a substantial question as to whether post-tort contacts are even relevant to the plaintiffs' demonstration of jurisdiction. Of course, if such contacts cannot be used to establish jurisdiction, the plaintiffs' request would fail on its face. See Noonan v. Winston, 135 F.3d 85, 95 (1st Cir. 1998) (holding that jurisdictional discovery was not warranted where it was aimed at an irrelevant time period). However, I need not resolve the matter on this basis given my conclusion that jurisdictional discovery is not warranted even assuming that post-tort contacts are relevant.

The plaintiffs' request for jurisdictional discovery must be denied for several reasons. Rather than formally moving for jurisdictional discovery before responding to the motion to dismiss, the plaintiffs opposed Armslist's motion to dismiss on the merits, and only requested jurisdictional discovery should I disagree. Presenting a request for jurisdictional discovery in this way contravenes both this court's Local Rules and the Federal Rules of Civil Procedure.

Local Rule 7.1(a)(1) provides that parties may not "combine multiple motions seeking separate and distinct relief into a single filing," which the plaintiffs violated by asking in their opposition to Armslist's motion to dismiss that I stay ruling on the motion and allow jurisdictional discovery if I was not willing to deny the motion on the existing record. Additionally, Federal Rule of Civil Procedure 7(b) requires that a request for a court order be made via written motion. As a general rule, "informal requests for court orders contained within . . . opposition papers" are "insufficient to satisfy [this] motion requirement[.]" Wright & Miller, 5 Federal Practice & Procedure § 1191 (4th ed. 2023). Accordingly, the First Circuit has recognized that parties do not properly present a request for jurisdictional discovery by "merely mention[ing] the option of jurisdictional discovery in [an] opposition to [a] motion to dismiss." Motus, 23 F.4th at 127-128; see also United Techs. Corp. v. Mazer, 556 F.3d 1260, 1280-1281 (11th Cir. 2009) (affirming the

22

denial of jurisdictional discovery where the plaintiff "never formally moved the district court for jurisdictional discovery but, instead, buried such requests in its briefs as a proposed alternative" to granting the motion to dismiss).

Even if I were to disregard the plaintiffs' procedural missteps, policy considerations counsel against granting such requests for discovery in the alternative to a request for a ruling on the merits. Cf. N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 648 (2d Cir. 2005) ("a party's failure to seek discovery under Rule 56(f) before responding to a summary judgment motion is 'itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'") (quoting Williams v. R.H. Donnelly, Corp., 368 F.3d 123, 126 n.1 (2d Cir. 2004)). Requesting a ruling on the merits before seeking discovery potentially burdens both the court and the parties with the need to engage in two rounds of briefing on the same issue: one prior to the receipt of discovery, and one after. These inefficiencies can, and should, be avoided by undertaking a clear-eyed assessment of the evidence at the outset and moving for whatever additional discovery is needed to establish jurisdiction, without first attempting to oppose the motion with an incomplete record.

The plaintiffs' request for jurisdictional discovery is also deficient because it does not identify the discovery they seek or explain how it would

confer jurisdiction. The plaintiffs' opposition brief generally asserts that they should be "entitled to probe Armslist's assertions and obtain updated evidence," but fails to offer any specifics. Doc. 28-1 at 22. The plaintiffs provided at least some additional substance to their request at the motion hearing, where they clarified that they were seeking discovery on Armslist's post-tort contacts with New Hampshire. Doc. 35 at 8, 21-22 (expressing the belief that jurisdictional discovery would reveal "many more premium vendors, more advertising, more significant contacts, [and] more sales in New Hampshire that were brokered by Armslist").

        But absent from the plaintiffs' proffer are any "factual allegations suggesting with reasonable particularity the possible existence of contacts" sufficient to confer jurisdiction. Eurofins Pharma U.S. Holdings v. BioAlliance Pharma SA, 623 F.3d 147, 156 (3d Cir. 2010). For example, the plaintiffs have not explained what sort of "significant contacts" they expect to discover, nor have they provided any basis for their belief that Armslist has engaged in "more advertising" or obtained "more premium vendors." Cf. Doane v. Benefytt Techs., Inc., No. 22-10510-FDS, 2023 WL 2465628, at *14 (D. Mass. March 10, 2023) (denying a request for jurisdictional discovery based on a proffer couched in "conclusory terms" without "specific facts of any kind in support of [the plaintiff's] contentions").

The plaintiffs' failure to provide a more specific proffer is all the more concerning given that they received at least some amount of New Hampshire-specific jurisdictional discovery during the Massachusetts action. See Rice v. Electrolux Home Prods., Inc., 4:15-cv-00371, 2020 WL 247284, at *11 (M.D. Pa. Jan. 15, 2020) (collecting cases and noting that, "[w]here a plaintiff has had the opportunity to conduct jurisdictional discovery, and then fails to make out a prima facie case of personal jurisdiction, courts are entitled to deny the plaintiff's request for further jurisdictional discovery"). The plaintiffs' nonspecific and conclusory proffer thus should be denied because it raises the specter of an impermissible "fishing expedition based only upon bare allegations." Univ. of Mass. v. L'Oreal SA, 36 F.4th 1374, 1385 (Fed. Cir. 2022) (quoting Eurofins, 623 F.3d at 157).

## IV.   **CONCLUSION**

For the foregoing reasons, the defendant's motion to dismiss for lack of personal jurisdiction (Doc. 21) is granted and its motion to dismiss for failure to state a claim (Doc. 20) is denied as moot. The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

July 15, 2024

cc:   Counsel of record

25